LAMBDA ELECTRONICS CORPORA-
TION, and Veeco Instruments,
Incorporated, Plaintiffs,

v.

LAMBDA TECHNOLOGY,
INCORPORATED,
Defendant.

No. 79 Civ. 7054(RJW).

United States District Court,
S. D. New York.

April 20, 1981.

Morgan, Finnegan, Pine, Foley & Lee, New York City, for plaintiffs by Thomas P. Dowling, Thomas M. Gibson, Allen Kipnes, New York City.

Rivkin, Sherman & Levy, New York City, for defendant by Thomas A. Greene, Mary P. Carty, Richard W. Cohen, New York City.

ROBERT J. WARD, District Judge.

This is the decision of the Court.

Plaintiff Veeco Instruments, Inc. ("Veeco"), is the owner of the registered trademark "LAMBDA," used in its business of designing, manufacturing, and selling electronic power supplies and power semiconductors. Other registered trademarks owned by Veeco, and used in the same business, include two logos, and the word Lambda juxtaposed with a logo. The logos each consist of the Greek letter symbol for lambda within a surrounding triangle. Defendant in this action, Lambda Technology, Incorporated ("Lambda Technology"), is primarily engaged in the business of designing and developing customized software applications in the information processing market. In so doing, Lambda Technology uses the tradenames "Lambda Technology" and "Lambda," and a logo consisting of the Greek letter symbol for lambda within a triangular configuration.

This action charges that Lambda Technology's use of its tradenames and its logo constitutes trademark infringement under 15 U.S.C. Section 1114(1), and a false designation of origin under 15 U.S.C. Section 1125(a), dilutes the distinctive quality of plaintiffs' marks in violation of N.Y.Gen. Bus. Law Section 368–d, and violates common-law principles of trademark infringement and unfair competition. Plaintiffs seek (1) injunctive relief against Lambda Technology's continued use of its tradenames and its logo; (2) an accounting for the purpose of awarding plaintiffs the profits derived by Lambda Technology from its unlawful activity; and (3) an award of attorney's fees. Lambda Technology has counterclaimed, seeking a declaratory judg-

ment limiting Veeco's marks to the goods recited in its registrations.

The Court, having heard the testimony adduced during the four days of trial, having examined the trial exhibits, having reviewed its contemporaneous trial notes, which include the Court's appraisal of the witnesses and their demeanor, and having evaluated the pertinent legal principles, finds, upon the totality of the testimony and documentary evidence, that plaintiffs are entitled to the injunction that they seek, but to no other relief, and that Lambda Technology is not entitled to any relief. This oral decision constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52, Fed.R.Civ.P.

### Plaintiffs' Business

Veeco is a corporation organized in 1951 under the laws of the State of New York and having its principal place of business at 515 Broad Hollow Road, Melville, New York. The second plaintiff in this action, Lambda Electronics Corporation ("Lambda Electronics"), was organized under the laws of the State of New York in 1975. Lambda Electronics, a wholly-owned subsidiary of Veeco, also has its principal place of business at 515 Broad Hollow Road, Melville, New York.

Lambda Electronics is not actively engaged in any business. It is a successor corporation to an earlier Lambda Electronics Corporation ("Lambda Electronics of 1948"), which was incorporated under the laws of the State of New York in 1948. Lambda Electronics of 1948 became a subsidiary of Veeco in 1965. On September 30, 1975, Lambda Electronics of 1948 formally merged with Veeco and ceased to exist as a corporation. Lambda Electronics, the plaintiff along with Veeco herein, was created on the same day.

During its twenty-seven year corporate life, Lambda Electronics of 1948 engaged in the business of designing, manufacturing, selling, and servicing electronic power supplies, and components thereof, throughout the United States, including the State of New York. Power supplies are devices that convert alternating current, as delivered by a utility, into the direct current required to operate electronic equipment. In the years between 1955 and 1970, Lambda Electronics of 1948 obtained four trademark registrations relevant to the subject matter of this lawsuit ("the LAMBDA marks"): (1) Registration Number 600,289, dated January 4, 1955, being a logo consisting of the Greek letter symbol lambda in dark ink on a white field having a dark triangular border; (2) Registration Number 785,920, dated March 2, 1965, being the word "LAMBDA;" (3) Registration Number 900,211, dated October 6, 1970, being the word "LAMBDA" juxtaposed with a logo consisting of the Greek letter symbol lambda in white on a dark triangular field that is bordered first by a white triangular band and on the outside by a thin dark triangular line; and (4) Registration Number 902,582, dated November 17, 1970, being a logo identical to that contained in Registration Number 900,211. Registration Numbers 600,289 and 785,920 covered power supplies. Registration Numbers 900,211 and 902,582 covered electrical measuring and power instruments, components, and systems. Lambda Electronics of 1948 sold power supplies and the components thereof under each of these trademarks during the period of its existence.

As a result of the merger of Lambda Electronics of 1948 into Veeco, Veeco became the owner of the LAMBDA marks. Veeco duly recorded a Certificate of Merger in the United States Patent and Trademark Office on June 9, 1976. While this merger resulted in the creation of Lambda Electronics, Veeco chose not to carry on the business of Lambda Electronics of 1948 through this successor corporation, but rather through a division of Veeco itself ("the Lambda Electronics Division"). Registration Number 600,289 has been renewed in accordance with 15 U.S.C. Section 1059. The affidavits required by 15 U.S.C. Sections 1058(a) and 1065 for the other LAMBDA marks have been filed. As a consequence, each of the LAMBDA marks is in full force and effect and has become incon-

testable under 15 U.S.C. Section 1065, thereby entitling Veeco, as their owner, to all rights and benefits granted under 15 U.S.C. Sections 1065, 1115(a), and 1115(b).

The Lambda Electronics Division, like its predecessor Lambda Electronics of 1948, engages in the business of designing, manufacturing, selling, and servicing power supplies under the LAMBDA marks now owned by Veeco. The Lambda Electronics Division engages in this business throughout the United States, including New York State. Its power supplies are sold for use in and with a variety of military, industrial, and commercial electronic equipment, including programmable data processing computers.

In 1975, the Lambda Electronics Division commenced the manufacture of power semiconductors and the components thereof, for use in power supplies. These are also marketed under the LAMBDA marks listed above. At present, approximately fifteen percent of Veeco's semiconductors and semiconductor components are used in the production of Veeco's own power supplies; the remainder are sold to the merchant market. For power supply applications, the Lambda Electronics Division manufactures a broad range of monolithic and hybrid voltage regulators. Other semiconductor products produced by the Lambda Electronics Division for power supplies include overvoltage protectors and monolithic rectifiers. Veeco's semiconductor plant also manufactures Darlington and switching transistors. The largest market for Veeco semiconductors is in computer peripherals, such as disk drives, tape drives, and video displays. They are also used in control systems, commercial systems, and instruments.

The Lambda Electronics Division has been extremely successful in recent years. Net sales for Veeco's products sold under the LAMBDA marks have increased from $25,000,000 in 1975 to $65,000,000 in 1979. Measured by dollar volume, forty percent of Veeco's sales involving power supplies and semiconductors are directed to programmable data processing computer systems embodying software and hardware. Various surveys introduced into evidence by Veeco (Plaintiffs' Exhibits 173–176) demonstrate that Veeco has attained a position of particular prominence with respect to the power supplies that it markets under the LAMBDA marks. For example, Plaintiffs' Exhibit 176, the "26th Annual Audit of Brand Recognition by the Electronic Original Equipment Market," prepared by *Electronic Design* magazine, places Veeco (under the name "Lambda Electronics Corp.") first in "brand recognition" for no fewer than seven types of power supplies. See pages 121–127. Indeed, this survey shows that Veeco has obtained "brand recognition" for an eighth type of power supply, so-called "uninterruptible power supplies," that it does not even manufacture. See page 128. The same survey demonstrates that Veeco is recognized, under the LAMBDA name, as a leading manufacturer of voltage regulators. See page 182.

During the last three decades, first Lambda Electronics of 1948 and later Veeco have extensively advertised and promoted their power supply and semiconductor products under the LAMBDA marks. Since 1972, Veeco has spent more than $6,000,000 advertising the LAMBDA marks, and since 1976 over $3,500,000 has been spent in a comprehensive advertising program for this purpose. This advertising is conducted, in part, by direct mailing of product catalogues and product brochures to over 145,000 individuals in the electronics and related fields each year. These individuals are predominantly design engineers and engineering supervisors. Each person on Veeco's mailing list annually receives about thirty brochures as the result of six to ten mailings per year. Veeco also heavily advertises the LAMBDA marks in electronic trade journals such as *Electronic News*. Veeco periodically issues press releases to advise the public of new products to be sold under the LAMBDA marks and of other information relative to the corporate activities of Veeco and the Lambda Electronics Division.

It is scarcely surprising, in light of the extensive promotional efforts just described, that ever since its 1965 acquisition of Lambda Electronics of 1948, Veeco has consistently taken steps to protect the LAMBDA marks against unauthorized use by other companies in the electronics and related fields. In 1966, for example, Lambda Electronics of 1948 filed a complaint for trademark infringement against Lambda Microwave Corporation, a producer of microwave components, in the United States District Court for the District of Massachusetts. This suit was settled prior to being adjudicated on the merits; as part of the settlement, the defendant agreed to discontinue its use of the LAMBDA marks. In 1972, Lambda Electronics of 1948 instituted a proceeding against Litton Systems, Incorporated, in the United States Patent Office before the Trademark Trial and Appeal Board, opposing Litton's application for registration of the mark LAMBDA on optical scientific devices. Litton filed a written abandonment of its application in 1974. In 1974, Lambda Electronics of 1948 filed an action for trademark infringement in the United States District Court for the Eastern District of Virginia against Lambda Corporation, a Delaware corporation that had its principal place of business in Arlington, Virginia, and that was engaged in the business of providing computer programming services and systems analysis services. This suit was settled prior to an adjudication on the merits; as part of the settlement, the defendant agreed to discontinue its use of the LAMBDA marks. In 1976, Lambda Electronics requested a second Lambda Corporation, this one having its principal place of business in Whippany, New Jersey, to discontinue its use of the LAMBDA marks on certain acoustical products using electronic equipment for measuring noise levels. This Lambda Corporation agreed to terminate its use of the LAMBDA marks by the end of 1976. In 1978, Veeco requested the Lambda Instrument Corporation, a corporation having its principal place of business in Lincoln, Nebraska, to cease its use of the LAMBDA marks on certain electronic equipment. In 1980, simi-

lar cease and desist letters were sent by Veeco to (1) Camelot Direct, a division of United Educators, Inc., located in Lake Bluff, Illinois, and engaged in selling an automatic telephone dialer under the name "Lambda Compuphone"; and (2) Lambda Computer Services, Inc., a corporation located in Huntington, New York, that was engaged in the business of selling computer software and computer equipment. Camelot Direct has since agreed to discontinue its use of the LAMBDA marks. Later in 1980, Veeco registered the LAMBDA marks with the United States Customs Service for the purpose of preventing two Hong Kong corporations, Lambda Electronics, Ltd., and Lambda Tele-Equip, from importing goods bearing the LAMBDA marks into the United States.

The history just recited requires the Court to reject Lambda Technology's argument that Veeco has not vigorously policed the LAMBDA marks, with respect to entities other than Lambda Technology, during certain of the years involved in the instant controversy. While trademark searches have been received in evidence that show a number of uses of the LAMBDA marks that have not been challenged by Veeco, the record does not disclose a single instance where Veeco acquiesced in the use of the LAMBDA marks by a viable company engaged in selling goods or services in the electronics field.

*Defendant's Business*

The corporate history of Lambda Technology, the defendant in this action, is somewhat complicated. It begins with the organization of JGM Investors Group, Inc., on July 2, 1975, under the laws of the State of Delaware. This corporation changed its name to Lamda [sic] Technology, Inc., on September 22, 1975, and then to Lambda Technology, Incorporated, on September 26, 1975. It is this entity that is named as the defendant in the Amended Complaint filed in this action on September 26, 1980. On January 1, 1981, however, all of the assets and liabilities of Lambda Technology, Incorporated, were transferred to General Elec-

tric Information Services Company ("GEIS-CO"), a Delaware corporation that is a majority-owned subsidiary of General Electric Company. The assets were immediately transferred in turn to a wholly-owned subsidiary of GEISCO, which subsidiary changed its name on January 1, 1981 to Lambda Technology, Inc. The record before the Court does not indicate that Lambda Technology, Incorporated, was dissolved following the transfer of its assets and liabilities to GEISCO. No motion has been made to substitute Lambda Technology, Inc., for Lambda Technology, Incorporated as the named defendant herein pursuant to Rule 25(c), Fed.R.Civ.P. The defendant in this action is thus Lambda Technology, Incorporated. For the sake of convenience, however, the Court in this decision will frequently refer to Lambda Technology, Incorporated, and its successor Lambda Technology, Inc., interchangeably as "Lambda Technology."

Lambda Technology engages in the design and development of customized software applications, better known as computer software, in the information processing market. Another portion of its business involves supplying highly qualified technical personnel and systems analysts to supplement a client's data processing staff. Lambda Technology sells its services throughout the United States, including the District of Columbia and the States of Delaware, California, New Jersey, New York, Pennsylvania, Alabama, Connecticut, Illinois, Michigan, Texas, and Washington. It also sells its services overseas, including the countries of Belgium, Holland, and Canada. Lambda Technology currently has approximately 175 customers.

In its first year of operations, 1975, Lambda Technology had nineteen employees and net revenues of $107,408. Its net revenues have increased each year as follows: 1976—$2,037,952; 1977—$6,042,902; 1978—$11,785,127; 1979—$18,511,308; 1980 —$28,079,000. By the end of 1980 it had over 600 employees and had opened offices in New York, Chicago, Philadelphia, San Francisco, Los Angeles, Piscataway, New Jersey, and White Plains, New York. It

intends to open a Dallas office in the near future.

The name "Lambda Technology, Incorporated" was one of the twelve that the principals of Lambda Technology considered adopting in 1975. Each of the proposed names consisted of a Greek letter (such as alpha, beta, or gamma) juxtaposed with the word "technology" or "systems." "Lambda Technology, Incorporated" was the fifth choice among these twelve names. When the first four proposed names proved unavailable upon consultation with the appropriate State officials in New York and Delaware, the name "Lambda Technology, Incorporated" was selected as the first available choice. Lambda Technology did not conduct a trademark search of "Lambda" prior to changing its name to "Lambda Technology, Incorporated." The principals of Lambda Technology had no knowledge of the existence of Lambda Electronics, Lambda Electronics of 1948, or the Lambda Electronics Division at the time they selected the corporate name of "Lambda Technology, Incorporated."

Lambda Technology uses the tradename "Lambda Technology" on its letterhead, invoices, and technical brochures, and has done so since 1975. It frequently refers to itself simply as "Lambda" in product brochures, correspondence, and in everyday business activities such as answering the telephone, and also often uses the acronym "LTI" as a corporate tradename. Since 1978, it has employed a corporate logo that consists of the Greek letter symbol for lambda within a triangular configuration.

Lambda Technology sells its services primarily through references and the efforts of its marketing representatives and its officers. The marketing representatives at Lambda Technology are required to be knowledgeable about and to have experience in programming or marketing techniques before being hired by Lambda Technology. These marketing representatives market the services of Lambda Technology directly to the individuals in charge of their clients' or prospective clients' data process-

ing or information services. The method by which Lambda Technology markets its services means that it is not required to advertise for customers in the print, video, or radio media. Thus, while Lambda Technology has advertised extensively in newspapers across the United States for personnel, it has made no appreciable expenditure on advertising its services.

### Relationship of the Parties' Businesses

Veeco and Lambda Technology are not competitors. This fact does not mean, however, that their businesses are not related in any manner that is relevant to this lawsuit. The electronic components sold by Veeco under the LAMBDA marks and the software sold by Lambda Technology are complementary products; that is, they are both sold in the electronics field and are primary elements of computers used in data processing. Producers of power supplies and other computer-related equipment, including Veeco, advertise in the same publications as computer software companies. Without power supplies and semiconductors such as are produced by Veeco, or without the software such as is developed by Lambda Technology, data processing computers are incapable of performing their functions.

The relationship between the parties' businesses does not end there. Since Veeco produces some products that require customized software, it is necessary for Veeco to understand the software implications of the particular hardware components that it manufactures. An example of this necessity is the production of micro-computers. The design of micro-computers requires a simultaneous design of the hardware and software components of the machine, the reason being that certain of the software is coded directly into the hardware. As a result, Veeco, which manufactures semiconductors for microprocessors, maintains a staff of software engineers in spite of the fact that it markets no software under the LAMBDA marks and has no present intention to do so in the future.

What has just been said regarding Veeco is also true, though somewhat in the converse, for Lambda Technology. In order to provide its clients with effective advice, Lambda Technology must understand the software implications of a client's currently existing hardware, and also must know the software implications of hardware generally available in the market. Thus, Lambda Technology employs technical personnel capable of evaluating a client's existing hardware performance and usage, and new hardware products developed within the industry. Lambda Technology also frequently advises its clients on the general sorts of hardware that they should buy if they have not already purchased hardware.

The natural relationship between computer software such as Lambda Technology designs and computer hardware sold by Veeco under the LAMBDA marks is illustrated by the fact that a number of companies in the United States produce both. Indeed, *Electronic Design's* earlier referred to "26th Annual Audit of Brand Recognition by the Electronic Original Equipment Market" indicates that Motorola Semiconductor Products, Inc., Texas Instruments, Inc., Hewlett-Packard Company, and Intel Corporation are among the *preferred* suppliers of *both* software packages of the type produced by Lambda Technology and voltage regulators such as are manufactured by Veeco under the LAMBDA marks. Hewlett-Packard is also a preferred supplier of power supplies of the type that Veeco sells under the LAMBDA marks.

Lambda Technology itself recognizes the natural relationship between the hardware and software sides of the computer industry. In its certificate of incorporation, Lambda Technology expressly stated that the business it proposed to conduct included not only "the development ... of computer programs, systems and other software," but also dealing in "any computer hardware necessary for the use and operation thereof." Moreover, Lambda Technology's Executive Vice President, Mr. Francis J. Casagrande, testified with respect to Lambda Technology's efforts to find a merger partner that Lambda Technology focused particularly on computer hardware companies

as candidates because of the "obvious synergy" that would inhere in such a combination.

Indeed, there is perhaps no better testimony to the synergistic relationship that exists between the businesses of the parties to this lawsuit than the General Electric Company, the entity of which Lambda Technology is now a part. The *Electronic Design* survey shows that General Electric is a preferred supplier of voltage regulators such as are produced by Veeco under the LAMBDA marks. While it is not recognized in the survey as a preferred producer of power supplies, a recent issue of *Electronic News*, introduced into evidence by Veeco, discloses General Electric's intention to introduce a new line of power supplies that would bring it into "closer competition with entrenched suppliers such as Lambda." Of course, even before it acquired Lambda Technology, General Electric was involved in the data processing services side of the computer industry through its majority ownership of GEISCO.

The most striking illustration of the "synergy" about which Mr. Casagrande testified is the production, by a number of companies, of so-called "turnkey" systems: systems that integrate the hardware and software elements of a data processing computer into a single system to be sold as a unit to customers. A given turnkey system, then, might include software such as is designed by Lambda Technology along with a power supply or semiconductors such as are manufactured by Veeco under the LAMBDA marks. Before its acquisition by GEISCO, Lambda Technology could not fairly be characterized as a producer of turnkey systems, having sold only one during the entire period of its existence. However, the "Operating Principles" that are to govern the operations of Lambda Technology after the merger state that "The intent of GEISCO is that the company [Lambda Technology] expand its product line from its professional services market to other market segments, such as, but not limited to, software products and turnkey systems." Thus, it can be expected that in the future Lambda Technology will market, under its tradenames and logo, turnkey systems that will, of necessity, incorporate power supplies and semiconductors such as are manufactured by Veeco under the LAMBDA marks.

### The Dispute Between the Parties

Veeco first learned of the existence of Lambda Technology in early 1976. On April 5, 1976, counsel for Veeco sent a letter to Lambda Technology, calling upon Lambda Technology to terminate its use of the name and mark "Lambda" on the ground that substantial and irreparable damage would result to Veeco's business and its rights in the LAMBDA marks if Lambda Technology's use persisted. Counsel for Lambda Technology replied to this letter on April 15, 1976, by commenting that Veeco was engaged in the sale of computer hardware whereas Lambda Technology rendered computer software services to its clients, meaning that "The channels of trade are so different that it is inconceivable that confusion could be created by our client's use of the name or mark 'Lambda.'" Veeco's counsel sent a second letter on July 23, 1976, which argued that "there is a clear likelihood of confusion" between Veeco and Lambda Technology as a result of Lambda Technology's use of "Lambda," and sought "a prompt reassurance" that Lambda Technology would "promptly cease and desist all use of the name and mark 'Lambda.'" No such reassurance was forthcoming; counsel for Lambda Technology replied on July 26, 1976, by rejecting both Lambda's "arguments" and its "logic," and implicitly adopting the position that Lambda Technology's use did not constitute trademark infringement.

There the matter rested for three and one-half years, until December 28, 1979, when Veeco commenced this action by filing a complaint in this Court. In the intervening period, Veeco made no further efforts to dissuade Lambda Technology from its use of "Lambda." Lambda Technology continued to use the tradenames "Lambda Technology" and "Lambda," and in 1978 modified its logo to the present design. Nevertheless, Veeco did not commence suit

until the end of 1979. The explanation for Veeco's delay is clear. In 1976, Lambda Technology was a fledgling corporation that had been in business for less than a year. Since Lambda Technology did not advertise its services, it was not until some years later, when Lambda Technology began to attain its prominence as a developer of computer software and instances of confusion between Veeco and Lambda Technology began to occur, that Veeco realized the extent of Lambda Technology's presence in the computer field and thereby concluded that a potential harm to Veeco's interests existed that required legal action. Lambda Technology, for its part, made no further effort to communicate with Veeco during this interim period, and sought a declaratory judgment that its use of "Lambda" was valid only as a counterclaim to Veeco's action.

The above-noted instances of confusion between Veeco and Lambda Technology that prompted the commencement of this action commenced in late 1979 when General Motors Corporation sent Veeco a check payable to "Lambda Electronics" in the amount of $8,839.10. This check purported to make payment to Veeco on two invoices, one in the amount of $136.82 and the second in the amount of $8,703.10. The second invoice, however, represented services performed for General Motors not by Veeco or the Lambda Electronics Division, but rather by Lambda Technology. Thus, $8,703.10 of the check represented an amount erroneously paid by General Motors to Lambda Electronics.

Similar incidents to the one just described occurred throughout 1980 and 1981. On or about January 19, 1980, General Motors sent payment in the amount of $7,487.00 to Veeco for services that were in fact performed by Lambda Technology. In late 1979 or early 1980, General Motors sent to Lambda Technology a check payable to "Lambda Electronics." In April 1980, the Western Union Telegraph Company sent Veeco a check payable to "Lambda Electronics" in the amount of $25,882.50; this amount represented the sum of five invoices for services performed by Lambda Tech-

nology for Western Union. In April, May, June, and July 1980, Veeco received four checks made payable to "Lambda Electronics" from New York Telephone Company in the amounts of $1,925.00, $2,062.60, $2,750.00, and $550.00; these amounts represented services rendered to New York Telephone by Lambda Technology. In January 1981, International Telephone and Telegraph Company sent to Veeco a check made payable to "Lambda Electronics" in the amount of $1,840.00; this amount represented services performed for ITT by Lambda Technology.

More than checks were misdirected during this period. In April and May 1980, Western Union sent three confirming orders to Veeco, addressed to "Lambda Electronics Corp.," purporting to confirm purchase orders made with Veeco, copies of which were introduced as Plaintiffs' Exhibits 13–15. None of these confirming orders represented orders that had in fact been placed with Veeco or the Lambda Electronics Division. Two of these confirming orders represented orders that Western Union had placed with Lambda Technology. Compare Plaintiffs' Exhibits 14–15 with Plaintiffs' Exhibit 16. Later in 1980, Western Union mailed an order to Lambda Technology in an envelope that listed "Lambda Electronics" as the addressee.

The existence of uncertainty or confusion regarding the relationship, or lack thereof, between Veeco and Lambda Technology, which may be inferred from the misdirected correspondence described above, was directly observed by those persons most capable of ascertaining it: the salesmen and marketing representatives of Veeco and Lambda Technology. Three salesmen employed by Veeco were asked whether Lambda Technology were related to Lambda Electronics or if Lambda Electronics had been acquired by General Electric. Specifically, Mr. Dennis Hall was asked by a purchasing agent of Electronic Vehicle Association if Lambda Electronics had been acquired by General Electric. Mr. Dan Wolfe was asked by an employee of Hughes Aircraft Company if Lambda Electronics had creat-

ed another division by the name of Lambda Technology. Mr. Dan Hite was asked by the purchasing supervisor of General Electric responsible for the purchase of power supplies and other electronic components if Lambda Electronics had been purchased by General Electric and if Lambda Technology was related to Lambda Electronics.

All four Lambda Technology marketing representatives that were questioned were asked by prospective or existing customers whether Lambda Technology was related to or associated with Lambda Electronics. Ms. Susan Rathbone was asked by prospective customers of Lambda Technology during six of sixty "cold calls" whether Lambda Technology was related to Lambda Electronics. Ms. Bonnie Schober was asked between six and twelve times by prospective and existing Lambda Technology customers if Lambda Technology was associated with Lambda Electronics. Ms. Karen Kalajian was asked about a dozen times by prospective Lambda Technology customers if Lambda Technology was related to Lambda Electronics. Ms. Sharon Teres was asked on two occasions by prospective customers at Lambda Technology if Lambda Technology was associated with Lambda Electronics.

*Plaintiffs' Federal Claims*

■ As noted earlier, plaintiffs commenced this action charging that Lambda Technology's use of its tradenames "Lambda Technology" and "Lambda" and of its logo constituted trademark infringement in violation of 15 U.S.C. Section 1114(1) and a false designation of origin in violation of 15 U.S.C. Section 1125(a). The legal standard applicable to claims presented under these sections is well known. The essential question in any case of alleged trademark infringement brought under the Lanham Act or under the law of unfair competition is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.

1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The Court's analysis of "likelihood of confusion" must be supplemented by a consideration of the "balance of the equities," which latter inquiry takes into account three interests: those of the senior user, those of the junior user, and those of the public consumer. *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir. 1976); *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 155 (S.D.N.Y.1980). The Court thus must first inquire whether the instant case presents any likelihood of confusion, and, if it does, then proceed to strike the balance of equities. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1139–40 (2d Cir. 1979); *see* Goldberg & Borchard, *Related Goods Trademark Cases in the Second Circuit*, 70 Trademark Rep. 287, 305–06 (1980).

■ The factors to which the courts are to refer in deciding whether or not there is infringement are set forth in the now classic case of *Polaroid Corp. v. Polorad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), where the Court of Appeals for this Circuit held that the relevant factors include, but are not limited to, (1) the strength of the senior user's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the senior user will bridge the gap; (5) actual confusion; (6) the junior user's good faith; (7) the quality of the junior user's product; and (8) the sophistication of the buyers. While the *Polaroid* standard was enunciated in the context of noncompeting goods, such as we have in the instant case, it has recently been extended to apply to cases involving competing goods as well. *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981).

Having in mind the two-stage analysis mentioned earlier, the Court is of the view that certain of the *Polaroid* factors are probative of likelihood of confusion, others assist analysis of the balance of the equities, and still others serve to aid both inquiries.

The Court also believes that it is important, in making use of the various *Polaroid* factors, to consider not merely *whether* any particular factor is implicated in the given case at hand, but the *degree* to which that factor is implicated. Finally, the Court notes that it views the individual *Polaroid* factors only as indicia of, and not as necessary conditions for, infringement. As a result, the fact that one or more of the *Polaroid* factors is not implicated by a given case does not determine the infringement issue, particularly if other of the *Polaroid* factors are strongly implicated by the situation presented. At the same time, no single factor is a *sufficient* condition to finding infringement. Rather, all the factors must be considered together according to the degree to which each is implicated by the case at hand.

■ Having stated the general legal principles that govern the Court's analysis of plaintiffs' federal claims, the Court proceeds first to determine whether there is any likelihood of confusion in the instant case, and then to strike the balance of equities.

### A. Likelihood of Confusion

In the Court's view, there are six factors probative of whether any likelihood of confusion exists in this case.

*1. Strength of the Mark.* The Court of Appeals for this Circuit has recently stated that, "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from the particular, although possibly anonymous, source." *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1131. Plainly, the possibility that a junior user's product will be confused for that of the senior user is a function of the distinctiveness of the senior user's mark. A mark can fall into one of four general categories, which, in order of ascending strength, are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. The strength of a mark is generally dependent both on its place upon the scale and on whether it has acquired secondary meaning; however, an otherwise strong mark may be diminished by evidence of unchallenged third-party use of the mark.

The LAMBDA marks, being common words or symbols applied in an unfamiliar way, are clearly "arbitrary" and thus fall in the strongest category of marks. *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 n.12 (2d Cir. 1976). The facial strength of the LAMBDA marks is enhanced by the secondary meaning they have attained in the electronics field by virtue of Veeco's heavy advertising budget and position of market leadership. *See McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1132. Lambda Technology's assertions that the strength of the LAMBDA marks has been diminished by third-party use are not borne out by any evidence of third-party use in products related to those of Veeco. In sum, the LAMBDA marks are extremely strong, meaning that the first factor probative of likelihood of confusion is significantly implicated in this case.

*2. Similarity Between the Marks.* It scarcely need be stated that the likelihood of confusion that exists in any case will be a function of the degree of similarity between the senior user's marks and the junior user's allegedly infringing uses. Here, we have an absolute identity between Veeco's registered mark LAMBDA and Lambda Technology's use of the tradename "Lambda." Even if Lambda Technology consistently used only the full tradename "Lambda Technology," and not the shorter version "Lambda," the addition of this word would not avoid a significant similarity between the two tradenames. In light of the fact that Lambda Technology's use would still constitute an appropriation of Veeco's *entire* mark, such a significant similarity could be avoided only if Veeco's mark were submerged into a composite mark of Lambda Technology's own creation. 3 R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies Section 82.-1(g), at 656 (3d ed. 1969). We have no such composite mark here, but merely the addi-

tion of a common word ("technology") to Veeco's arbitrary word ("lambda"). Finally, a simple side-by-side comparison of Veeco's LAMBDA logos with Lambda Technology's present logo reveals a striking similarity, though not an identity, between them. In conclusion, there is an undeniably close similarity between the LAMBDA marks and Lambda Technology's uses, meaning that this factor is also strongly implicated.

*3. Product Proximity.* The relevance of product proximity to likelihood of confusion is fairly apparent. Where the products in question are in some degree competitive, the degree to which consumers are likely to be confused as between the products themselves is a function of the competitive proximity of the products. Where, as here, the products are non-competitive, their proximity is still probative of likelihood of confusion insofar as it demonstrates, or fails to demonstrate, a likelihood that customers may be confused as to the source of the products. In this context, the concern is indirect harm that might result from the senior user's loss of good will or the tarnishing of the senior user's reputation. *See generally McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1134–35. "The impression that noncompeting goods are from the same origin may be conveyed by such differing considerations as the physical attributes or essential characteristics of the goods, . . . the service or function for which they are intended, the manner in which they are advertised, displayed or sold, the place where they are sold, or the class of customers for whom they are designed and to whom they are sold." 3 R. Callman, *supra,* Section 82.2(c), at 807. Here, the products have entirely dissimilar physical attributes and are sold through significantly different channels of trade. On the other hand, the products are complementary, both being intended to function in computers, and are sold by Veeco and Lambda Technology to many of the same customers. The Court thus concludes that there is some possibility that these products would be seen to emanate from a common source, and thus that there is a moderate product proximity here, meaning that this factor

cuts in favor, albeit minimally, of finding likelihood of confusion.

*4. Bridging the Gap.* In the likelihood of confusion context, "bridging the gap" refers to two distinct possibilities. The first is that the senior user presently intends to expand his sales efforts to compete directly with the junior user; likelihood of confusion is created by the likelihood that the two products will be directly competitive. The second possibility is that, while there is no present intention to bridge the gap, consumers will assume otherwise and conclude, in this era of corporate diversification, that the parties are related companies. *See McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1135–36. Here, the record demonstrates that Veeco has no present intention of bridging the gap. However, the Court finds that some consumers will likely conclude, as a result of the synergistic relationship between the two products detailed earlier, and particularly of the fact that other firms have bridged the gap and now sell both voltage regulators and software packages, that Veeco and Lambda Technology are related. This factor, then, also stands in favor of finding likelihood of confusion. For two reasons, however, this factor is not as powerfully implicated here as it might be in other cases. First, this is not a case where the desire of the senior user to bridge the gap creates an independent potential for confusion. What is more, Veeco, while a large company, is nevertheless significantly smaller than those companies that have heretofore integrated production of voltage regulators and software packages, diminishing the likelihood that it would be viewed by consumers as a potential gap-bridger.

■ *5. Actual Confusion.* The best evidence of likelihood of confusion is the occurrence of actual confusion and mistakes. As Chief Judge MacMahon of this Court has stated, "Although evidence of actual confusion is not essential to a finding of trademark infringement, there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *Grotrian, Helfferich, Schulz Th. Steinweg Nachf.*

*v. Steinway & Sons*, 365 F.Supp. 707, 715–16 (S.D.N.Y.1973), *aff'd*, 523 F.2d 1331 (2d Cir. 1975). It has often been recognized that a plaintiff usually faces a formidable task in obtaining proof of actual confusion as to the source of non-competing products. *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1231 (S.D.N.Y. 1977), *aff'd*, 580 F.2d 44 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

However, it cannot seriously be doubted that actual confusion has occurred here. Veeco's testimonial and documentary evidence of misdirected checks and orders is sufficient to show actual confusion. *Ferrara v. Scharf*, 466 F.Supp. 125, 134 (S.D.N.Y.1979). The Court is not persuaded by Lambda Technology's efforts to characterize these misdirected checks and orders as being merely "clerical" errors, and not reflective of the state of mind of the persons charged with actually making purchasing decisions. First, this argument is belied by the independent testimony of Veeco's salesmen and Lambda Technology's marketing representatives from which the Court infers that at least some individuals at the purchasing level were indeed confused about the Veeco-Lambda Technology relationship. Second, the amounts of money involved incline the Court to believe that the explanation does not lie in a simple clerical error.

The difficult question for the Court is not to decide whether the factor of actual confusion is present here, but rather to assess how significantly that factor is implicated by the facts of the case. This requires consideration of the magnitude of the actual confusion proven by Veeco. Veeco argues that the actual confusion in this case is "rampant"; Lambda Technology styles this actual confusion as being *"de minimis."* The truth lies somewhere between these two extremes. Lambda Technology persuasively points out that it receives numerous checks and orders from those companies that sent the half-dozen or so misdirected checks, and that its marketing representatives come in contact with thousands of potential or existing customers each year, making the reported instances of confusion

much less striking than they appear on their face. On the other hand, Veeco soundly argues that the recorded instances of actual confusion should be magnified by virtue of the general inaccessibility of such information, and also of the relatively brief period within which it occurred in this case.

Plainly, there is no analytical mechanism for determining that actual confusion is significant in one case, rampant in a second, and *de minimis* in a third. The trial judge must rely upon his own common sense rather than upon any well-articulated legal principle in such cases. Here, the Court is simply not persuaded that the numerous instances of actual confusion can be explained away in the manner suggested by Lambda Technology. Accordingly, the Court holds that there was appreciable actual confusion in this case, meaning that this particular likelihood of confusion factor is not only present here, but significantly implicated. At the same time, the Court does not view this actual confusion to be "rampant" in the manner suggested by plaintiffs. The Court accordingly declines plaintiffs' invitation to consider this actual confusion not only in its own right as a factor probative of likelihood of confusion, but also as probative of whether certain of the other *Polaroid* factors are implicated in this case. In the Court's view, to allow the evidence of actual confusion to play this dual role here would be to give this evidence more probative weight than it may justifiably be said to deserve.

*6. Sophistication of Buyers.* The relevant cases not only authorize, they instruct the trial court, in making the likelihood of confusion determination, to consider the level of sophistication of the relevant purchasers. *See, e. g., Miss Universe, Inc. v. Patricelli*, 408 F.2d 506, 509 (2d Cir. 1969). It is easy enough to see that every product, because of the type of buyer that it attracts, has its own distinct threshold for confusion of origin. *See Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 733 (2d Cir. 1978). Here, it is plain that the products of Veeco and Lambda Technology, because of their expense and technical na-

ture, attract a relatively sophisticated buyer. Computer power supplies and computer software packages are not the sort of products that are bought on impulse. The Court accordingly finds that the purchasers in this case are highly sophisticated, and that this factor cuts strongly against a finding of likelihood of confusion.

7. *Conclusion.* Among the six factors relevant to determining likelihood of confusion, then, two cut strongly in favor of finding a likelihood of confusion, three cut minimally or moderately in favor of such a finding, and only one stands in opposition to such a finding. The preponderance of factors permits but one conclusion: The plaintiffs have carried their burden of proof on the issue of likelihood of confusion. The Court accordingly holds that Lambda Technology's use of its "Lambda" and "Lambda Technology" trade names and of its logo creates a likelihood that an appreciable number of ordinarily prudent purchasers will be misled or confused as to the source of Lambda Technology's services. It remains for the Court to consider, as a predicate to finding infringement, the balance of the equities.

### B. Balance of the Equities

As noted earlier, in balancing the equities the Court must consider the interests of the public and of the senior user in relation to those of the junior user in deciding whether to find infringement and proceed to enjoin the junior user from continuing its unlawful use of the senior user's mark. The Court's finding that a likelihood of confusion exists in this case means that the interests of the public are, almost by definition, powerfully raised here. As the Court of Appeals for this Circuit recently stated, the trademark laws are designed precisely to protect the public's interest in not being misled by confusingly similar marks. *Scarves by Vera, Inc. v. Todo Imports Ltd., supra,* 544 F.2d at 1172. The Court's finding of a likelihood of confusion also implicates the interests of the senior user, for reasons that were expressed over fifty years ago by Judge Learned Hand in words that no one since has been able to improve upon:

"[A merchant's] mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful."

*Yale Electric Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir. 1928). In short, where, as here, the trial court has found a likelihood of confusion, the balance of equities tilts in the first instance toward a finding of infringement. Given this fact, there still remain a number of factors that the Court must consider in striking the balance of equities. Some of these factors potentially tip the balance still further toward a finding of infringement; others potentially implicate the interests of the junior user, and hence argue against a finding of infringement. The Court considers them in turn below.

1. *Bridging the Gap.* In a case of non-competitive products, the likelihood that the senior user will "bridge the gap" between the two products is probative not only of the likelihood of confusion, but also of the balance of equities. It is well settled that the trademark laws protect the senior user's interest in being able to enter a related field at some future time. *Scarves by Vera, Inc. v. Todo Imports Ltd., supra,* 544 F.2d at 1172. Thus, if Veeco had any present intention of entering the software field, it could make a powerful equitable argument in favor of a finding of infringement. Unfortunately for Veeco, it has no such present intention, meaning that this factor plays no role in striking the balance of equities in this case.

*2. Quality of Junior User's Product.* Where the junior user's product is of poor quality, the interest of the senior user in enjoining the junior user's conduct, and thus avoiding any confusion between itself and the junior user, is obviously heightened. Here, however, there is no suggestion that Lambda Technology's services are of anything but high quality. This factor thus also fails to play any role in striking the balance of equities in this case.

*3. Good Faith of Junior User.* It is fundamental that the state of mind of the junior user is an important factor in striking the balance of equities. If the junior user has acted entirely in good faith, it will have a powerful equitable argument against a finding of infringement. On the other hand, if the junior user adopted the plaintiff's mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement. Here, Lambda Technology acted in good faith in its selection of its corporate name and its decision to adopt the tradenames "Lambda" and "Lambda Technology." However, the Court is not persuaded that Lambda Technology acted entirely in good faith throughout the events leading to this litigation. Particularly, the Court is disturbed by Lambda Technology's decision in 1978, after having received actual notice of the LAMBDA marks, to adopt a logo far more similar to Veeco's logo than Lambda Technology's original logo. It is true, of course, that adoption of another's mark despite actual and constructive notice is not *necessarily* indicative of bad faith, because the presumption of an exclusive right to use a registered mark extends only so far as the goods or services noted in the registration certificate. *Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 48. Veeco's registration certificate does not cover goods such as Lambda Technology produces. However, other facts also cast doubt on the motives of Lambda Technology. In response to Veeco's first cease and desist letter, Lambda Technology implied that its activities were confined to New York County (whereas it was at that time engaged in a nationwide expansion program), and that

it used the word "lambda" only together with the word "technology" (whereas it actually routinely used the word "lambda" by itself in letters and brochures). Moreover, when the incidents of actual confusion detailed earlier began to occur, Lambda Technology took no significant steps toward remedying the problem. In sum, while the Court is not prepared to conclude that Lambda Technology acted in bad faith, it can weigh this factor only slightly in Lambda Technology's favor in striking the balance of equities.

*4. Junior User's Good Will.* The Court of Appeals for this Circuit has held that a powerful equitable argument against finding infringement is created when the junior user, through concurrent use of an identical trademark, develops goodwill in the mark. *Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 49. Here, while it is evident that Lambda Technology has enjoyed concurrent use of the LAMBDA marks for a number of years, there is little if any evidence in the record that Lambda Technology has built up any significant goodwill in either its tradenames or its logo. It engages in no appreciable advertising of its services. It has but approximately 175 customers. It is, if one reads its brochures, nearly as likely to use the tradename "LTI" as it is to use either "Lambda" or "Lambda Technology." As a result, the Court is simply not persuaded that the LAMBDA marks have any significant value to Lambda Technology. This conclusion is bolstered by the frank statement of Mr. Gabriel Battista, an employee of GEISCO familiar with the Lambda Technology merger negotiations, that the primary reason for maintaining the name "Lambda Technology" after the merger was to avoid disturbing the employees of Lambda Technology. Thus, while Lambda Technology has insisted that it would be irreparably harmed by being prevented from using the LAMBDA marks, the Court is constrained to find on the basis of the record before it that Lambda Technology has not developed a significant amount of goodwill in its tradenames or its logo, and would not be greatly harmed by

being required to discontinue its use of the LAMBDA marks. This factor thus does not present a significant equitable argument against a finding of infringement.

*5. Conclusion.* The four factors just mentioned do not, when considered under the facts of this case, present even a moderately strong equitable argument either for or against a finding of infringement. The Court's decision is thus controlled by its finding of a likelihood of confusion, and the equitable considerations in favor of finding infringement that this likelihood of confusion creates. Since the Court finds a likelihood of confusion and a balance of equities that favors a finding of infringement, it must rule in plaintiffs' favor on their federal claims unless Lambda Technology's defense of laches prevails.

## C. Laches

■ The Court of Appeals for this Circuit has recently stated the legal standard applicable to a laches defense raised in the context of a trademark action in its decision in *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037 (2d Cir. 1980). The Court adopted the following rule: "Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *Id.* at 1040 (quoting *Cuban Cigar Brands N.V. v. Upmann International, Inc.,* 457 F.Supp. 1090, 1096 (S.D. N.Y.1978), *aff'd,* 607 F.2d 995 (2d Cir. 1979)).

■ For a number of reasons, the laches defense is clearly unavailable under the facts of this case. The *Saratoga Vichy* standard requires "inexcusable delay" prior to "taking action" for the defense to be available. Here the letters sent by Veeco to Lambda Technology in 1976, which certainly were not preceded by "inexcusable delay" in any sense, constituted a sufficient "taking of action" to avert the defense. *See Saratoga Vichy Spring Co. v. Lehman, supra,* 625 F.2d at 1041. Even if these

letters did not constitute a sufficient "taking of action," Veeco's delay in filing the complaint was not, as described earlier, inexcusable; it resulted from the relatively low profile that Lambda Technology, being a fledgling corporation that conducted no advertising, maintained in the years 1976, 1977, and 1978. Finally, even if Veeco's delay could be described as "inexcusable," the Court does not find any prejudice to Lambda Technology that would make it "inequitable" to allow Veeco to assert its rights. As noted above, the record does not disclose that Lambda Technology has developed any significant good will in its tradenames or its logo, meaning that it would not be seriously prejudiced by being required to phase out its use of the LAMBDA marks. For all these reasons, the Court rejects Lambda Technology's laches defense, and finds that Lambda Technology has violated 15 U.S.C. Sections 1114(1) and 1125(a).

## *Plaintiffs' State Claims*

■ As noted, plaintiffs' state claims are that Lambda Technology's use of its tradenames and its logo dilutes the distinctive quality of the LAMBDA marks in violation of N.Y.Gen.Bus. Law Section 368–d, and violates common-law principles of trademark infringement and unfair competition. Adjudication of these claims is made relatively easy by virtue of the Court's finding of a likelihood of confusion in the context of its discussion of the federal claims. Statutory trademark dilution, common-law trademark infringement, and common-law unfair competition are all made out by a showing of a likelihood of confusion and a balance of equities favoring the senior user such as the Court has found to exist here. *Berlitz Schools of Languages of America, Inc. v. Everest House,* 619 F.2d 211, 215 (2d Cir. 1980) (*sine qua non* of an action for trademark dilution or common-law unfair competition is a showing by the plaintiff of a likelihood of confusion as to the origin of the goods in issue). Accordingly, the Court finds that Lambda Technology has violated N.Y.Gen.Bus. Law Section 368–d, and com-

mon-law principles of trademark infringement and unfair competition. It only remains for the Court to consider the remedy to which plaintiffs are entitled.

### Remedy

The remedies sought by plaintiffs in this action include (1) injunctive relief against Lambda Technology's continued use of its tradenames and its logo; (2) an accounting for the purpose of awarding plaintiffs the profits derived by Lambda Technology from its unlawful activity; and (3) an award of attorney's fees. Given the Court's foregoing conclusions, there can be no doubt that plaintiffs are entitled to the injunctive relief that they seek; where there is a likelihood of confusion coupled with a balance of equities tipping in favor of the senior user, the courts will consistently enjoin the junior user's infringing use. *See, e. g., Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir. 1980). However, a more stringent standard must be satisfied to justify the Court's ordering an accounting or awarding damages or attorney's fees. In *Scarves by Vera Inc. v. Todo Imports Ltd., supra,* the Court of Appeals for this Circuit held that neither damages nor an accounting are proper in a case where the goods are non-competitive unless (1) there was a diversion of trade, and (2) the junior user acted in bad faith. 544 F.2d at 1175. A similar standard governs the award of attorney's fees. *See, e. g., Jones Apparel Group, Inc. v. Steinman*, 466 F.Supp. 560, 563–64 (E.D. Pa.1979). There is nothing in the record to indicate that the requisite diversion of trade occurred here. Nor, as has been noted earlier, does the Court find that Lambda Technology acted in bad faith or wilfully. Accordingly, there is no basis for the Court to order an accounting or to award either damages or attorney's fees.

### Conclusion

This case, like most trademark cases that proceed to trial, is not one where the Court is "overwhelmed by the sudden blinding light of the justness of one party's cause." *King Research, Inc. v. Shulton, Inc.*, 454 F.2d 66, 69 (2d Cir. 1972). In this area, the Court is confronted with the task of considering a number of factors, all of which are important but none of which are determinative, in endeavoring to determine the present likelihood that confusion will ensue at some unspecified future date. The Court is frank to say that, in this area, intuition and common sense inevitably take the place of refined legal analysis. To the extent it has any lingering doubts regarding the findings it has made and the conclusions it has reached, the Court takes solace in its firm conviction that Lambda Technology does not stand to suffer appreciable harm, if any at all, as a result of the injunction that is to be decreed as a result of today's decision.

In sum, plaintiffs have sustained their burden of showing violation of 15 U.S.C. Sections 1114(1) and 1125(a), N.Y.Gen.Bus. Law Section 368–d, and common-law principles of trademark infringement and unfair competition. Plaintiffs are entitled to a decree requiring Lambda Technology to discontinue its use of the tradenames "Lambda" and "Lambda Technology," and of its current logo. The decree shall allow Lambda Technology until December 31, 1981 to effect such discontinuance. Plaintiffs' claims for an accounting and an award of damages and attorney's fees are dismissed. Lambda Technology's counterclaim for a declaratory judgment is likewise dismissed.

Settle permanent injunction on notice.