**KARMIKEL CORPORATION, Plaintiff,**

v.

**The MAY DEPARTMENT STORES COMPANY, INC. and May Merchandising, Inc., Defendants.**

**No. 87 Civ. 0782 (PKL).**

United States District Court, S.D. New York.

April 20, 1987.

1362

Jacobs & Jacobs, P.C., New York City (Mark A. Sparrow and Jessie D. Reingold, of counsel), and Bell, Seltzer, Park & Gibson, Charlotte, N.C. (Floyd A. Gibson, Blas

P. Arroyo and John H. Thomas, of counsel), for plaintiff.

Skadden, Arps, Slate, Meagher & Flom, New York City (Miriam L. Siroky, Susan R. Reiss and Kathryn L. Barrett, of counsel), for defendants.

LEISURE, District Judge:

Plaintiff Karmikel Corporation ("Karmikel") brings this action claiming that a trademark, *see* Affidavit of Miriam L. Siroky, Esq., sworn to on April 9, 1987 ("Siroky Aff."), Exhibit 2 appended thereto, used by defendants, the May Department Stores Company ("May") and May Merchandising Corporation ("May Merchandising") (hereinafter collectively referred to as "defendants"), infringes Karmikel's trademark, *see* Plaintiff's Exhibit 2; Siroky Aff.Ex. 1. The instant action is now before the Court upon plaintiff's motion pursuant to Fed.R. Civ.P. 65 for a preliminary injunction. Based on the papers submitted by the parties, oral argument before the Court held on April 14, 1987, and for the reasons set forth below, plaintiff's motion is denied. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

**FINDINGS OF FACT**

**A.** *The Parties*

Plaintiff Karmikel is a manufacturer of wearing apparel, which is, and has been sold, throughout the United States primarily in department stores, including the stores owned by defendant May. Affidavit of Robert P. Phillips, sworn to on March 25, 1987 ("Phillips Aff."), ¶¶ 2 and 4. Karmikel's line of apparel includes men's, young men's, and boy's sportswear, including knit shirts, sweat suits, and jogging shorts. Karmikel's merchandise is low-priced, made from a blend of 50 percent cotton and 50 percent polyester and is sold in discount and budget stores and budget departments of department stores. Deposition of Robert P. Phillips, dated March 19, 1987 ("Phillips Dep."), at 14; Affidavit of Gary R. Boyson, sworn to on April 9, 1987 ("Boyson Aff."), ¶ 21. Plaintiff's business strategy appears to be "selling low-price knit shirts and athletic wear through discount stores...." *The Charlotte Observ-*

*er*, May 24, 1982, 6d, Siroky Aff.Ex. 18; *The Charlotte News*, July 18, 1984, 10A, Phillips Aff.Ex. B.

Defendants are May and May Merchandising. May is a New York corporation in the business of owning and operating department store chains and other retail outlets throughout the United States. Boyson Aff. ¶ 2. May Merchandising is a subsidiary of May and is engaged in, among other things, developing general marketing strategies for May's stores. May Merchandising performs its functions through various divisions, each responsible for a different category of merchandise, such as children's clothing, accessories, cosmetics and the like. Each individual store has its own buyers who select the vendors from whom they will purchase merchandise for resale in the May stores. Boyson Aff. ¶¶ 3–4.

**B.** *The Marks*

This dispute is based on the alleged infringement of Karmikel's "Fast Track" trademark. The trademark consists of the word "fast" placed above the word "track". The words are written on an angle. Both words are divided up by four jagged horizontal lines indicating speed. *See* P.Ex. 2; Siroky Aff.Ex. 1. The mark is used only on labels sewn inside the clothing, where it is consistently depicted in the color red, with the words "Made in U.S.A." printed below. *See* Siroky Aff.Ex. 1. The evidence indicates that plaintiff uses its "Fast Track" trademark interchangeably with four additional trademarks: "On Stage," "Tops Too," "Classic Line" and "Michael Scott."

In the spring of 1982, plaintiff adopted and commenced to use the trademark "Fast Track" for its lines of men's and boy's sportswear. On May 17, 1982, Karmikel applied to the United States Patent and Trademark Office (the "Trademark Office") for a Federal registration to use the mark on "clothing, namely, jogging suits, sweat suits and other active wear." *See* Siroky Aff.Ex. 3. The Trademark Office viewed the mark as consisting not only of the words "Fast Track" but of the entire design as well. *See* Siroky Aff.Ex. 4 (mark

consists of "Fast Track, Plus Design"). On December 23, 1982, the Trademark Office amended plaintiff's application, with plaintiff's consent, to limit the types of clothing to which the registration would apply. The amendment, included changing the broad term "active wear" to the narrower category "athletic shirts". Moreover, the description of the clothing was amended to read "clothing, namely, jogging suits, jogging shirts, sweat suits and athletic shirts." Siroky Aff.Ex. 4.

In April 1983, the Melville Corporation filed an opposition to Karmikel's registration on the ground that it conflicted with Melville's use of the trademark "Fast". *See* Siroky Aff.Ex. 5. The parties—after extensive litigation—settled their dispute on February 28, 1986. *See* Siroky Aff.Ex. 6. The eventual registration for Karmikel's mark, issued on June 10, 1986, Registration Number 1,296,873, covers use on "clothing, namely, jogging suits, jogging shorts, sweat suits and athletic shirts." *See* P.'s Ex. 2; Siroky Aff.Ex. 7. Although plaintiff's registration is specifically limited to the four aforementioned categories of clothing, Karmikel "has applied its federally registered trademark to a full line of boy's and young men's athletic wear and sportswear including sweatsuits, jogging shorts and sport shirts." Plaintiff's Memorandum in Support of its motion for a Preliminary Injunction ("P. Memo.") at 7–8; *see also* Phillips Dep. at 18 ("Fast Track" is used on all merchandise made by plaintiff other than one shirt style); Phillips Aff. ¶ 3.

Among plaintiff's earliest customers for "Fast Track" sportswear were department stores owned by May. Sales of "Fast Track" apparel by plaintiff to May commenced in approximately Mid–1982 in a modest amount with steadily increasing amounts until the spring of 1985. At that time, plaintiff claims that sales of "Fast Track" apparel by it to May-owned stores abruptly stopped; only isolated minuscule sales have occurred since May 1985. Total sales by plaintiff of "Fast Track" apparel to May have totaled approximately $250,-000.

Apparently, the aforementioned sales were always to May's downstairs or budget departments. May and May Merchandising have always distinguished between May's "upstairs" (meaning high quality) and budget departments. In fact, many May-owned stores have a separate "Budget Store" selling low-priced merchandise. A "Budget Store" Division at May Merchandising is responsible for the merchandising activities of the Budget Stores, in conjunction with budget buyers of the stores. *See* Boyson Aff. ¶¶ 5–7; Affidavit of Martin L. Rothman, sworn to on April 8, 1987 ¶ 2 ("Rothman Aff.").[1]

The evidence in the record suggests that the articles of clothing purchased by May from plaintiff were selected by style numbers instead of labels. In fact, plaintiff selected the label to be used on the merchandise and used these labels interchangeably. For the aforementioned reasons, it is reasonable to conclude that neither the labels nor the trademarks were of interest to May's Budget Department Buyers.

As noted earlier, defendants adopted and commenced to use their allegedly infringing mark, "Fast Trak", on young men's and boy's sportswear in the fall of 1985. Moreover, as described previously, at or around the same time, sales of "Fast Track" apparel by plaintiff to May's stores slowed and ultimately stopped except for isolated sales. Plaintiff implies that this sales decision resulted from defendants' intended infringement of plaintiff's trademark, as well as defendants' conscious decision to concentrate its purchases of such goods in the Far East as a means of maximizing profits. Plaintiff fails to provide any evidence in support of this argument.

Defendants, however, claim that their reduction of purchases of goods from plaintiff bearing the "Fast Track" label does not stem from any group decision or directive to discontinue purchases from plaintiff or

---

1. The most important factor governing the budget departments' selection of vendors and merchandise is cost. Trademarks and labels are not relevant to the budget departments' selection of merchandise. This strategy is in accordance with the price-consciousness of budget department customers.

purchases of any particular label. In fact, defendants assert that May Merchandising continued to recommend to its Budget Stores that they purchase from Karmikel in 1985 and 1986, without excepting "Fast Track" or any other label. *See* Rothman Aff. ¶¶ 9–14; Affidavit of Scott K. Lohmann, sworn to on April 8, 1977 ("Lohmann Aff.") ¶¶ 7–8; Affidavit of Emmary A. Allen, sworn to on April 8, 1987 ("Allen Aff.") ¶¶ 4–5; Affidavit of Michael A. Kornstein, sworn to on April 7, 1987 ("Kornstein Aff.") ¶¶ 8–11; Affidavit of Jerry W. Carter, sworn to on April 8, 1987 ("Carter Aff.") ¶¶ 7–8; Affidavit of Frank Huff, sworn to on April 8, 1987 ("Huff Aff.") ¶¶ 4–5; Affidavit of Timothy R. Smasal, sworn to on April 8, 1987 ("Smasal Aff.") ¶¶ 5–6. Defendants suggest that the cause of the reduction in their purchases of plaintiff's "Fast Track" mark was plaintiff's decision to use its other labels on the remaining sales of goods to May's stores. Defendants also direct the Court's attention to the overall drop, in both absolute and relative terms, of the Budget Stores' percentage of May's total sales. Finally, defendants note that decreases in purchases from plaintiff could be due, as well, to the softening of the foreign import market so the budget stores could obtain abroad goods comparable to plaintiff's at lower prices. *See* Rothman Aff. ¶¶ 12–13; Kornstein Aff. ¶¶ 8–10; Carter Aff. ¶ 7; Huff Aff. ¶ 4; Smasal Aff. ¶ 5.

The evidence in the record indicates that in the fall of 1983, May Merchandising began to consider adopting one or more new private labels of the Upstairs Mens Divison. The Upstairs Mens Division was already selling goods under various private labels and, indeed, one of the functions of May Merchandising was to develop private labels for sale by May stores. At the time, young men's and boy's wear commonly depicted fast automobiles or sports cars. May Merchandising sought to take advantage of that trend by developing a label using an illustration of a race car and using the words "Fast Trak." *See* Siroky Aff.Ex. 8. The label was approved in July, 1984 and May began to market goods bearing the label in early 1985. *See* Boyson Aff. at ¶¶ 10–11; Affidavit of Susan B. Lieber, sworn to April 9, 1987 ("Lieber Aff.") ¶¶ 4–5.

Despite plaintiff's arguments to the contrary, the evidence before the Court indicates that none of the individuals responsible for developing the "Fast Trak" label was aware of Karmikel or "Fast Track." In fact, the Court finds that these individuals first learned of plaintiff and its mark when the present action was commenced. Boyson Aff. ¶ 14; Lieber Aff. ¶¶ 7–8. Although plaintiff insists that such a position is not credible, defendants point out, and this Court finds, that in light of the autonomy of the May Merchandising Divisions, it is not surprising that the personnel responsible for developing labels were unaware of the May's stores' purchases from plaintiff under the "Fast Track" label.

In 1986, the sports car was eliminated from the "Fast Trak" label. The present label employs the words "Fast Trak" side-by-side in plain, black, block letters on a grey backround. There is no design of any kind on the label Boyson Aff. at ¶ 12; Lieber Aff. at ¶ 6; Siroky Aff.Ex. 2. The "Fast Trak" label has been used only on upstairs young men's walking shorts, swimwear, knit tops and outerwear, and on upstairs boys' walking shorts, swimwear, underwear and knit tops. The "Fast Trak" label has never been used on men's clothing. *See* Boyson Aff. at ¶ 13.

## C. *Procedural History*

Plaintiff claims that it first learned of defendants' use of the "Fast Trak" label in late January of 1987, almost two full years after goods were first marketed under the label. This action was filed on February 9, 1987. Expedited discovery has apparently been completed.[2] This motion for prelimi-

---

**2.** At oral argument, plaintiff's counsel suggested that the reason plaintiff had not presented more compelling evidence in support of its motion for a preliminary injunction is that defendants have obstructed plaintiff's proper discovery efforts. With respect to plaintiff's counsel's claim, the Court notes that plaintiff did not choose, for reasons known only to plaintiff's counsel, to move for an order compelling discovery. Moreover, the Court notes that plaintiff is the moving party and, as such, dictated the timing of the hearing of this motion.

nary injunction was prompted, according to plaintiff, by defendants' plans to sell out the goods labeled with "Fast Trak." Defendants concede that when the present lawsuit was commenced, they determined to discontinue using the "Fast Trak" mark solely because, as a matter of policy, they preferred to terminate a relatively minor label, rather than risk further controversy. All outstanding orders for garments on which May Merchandising had anticipated using the "Fast Trak" mark will be completed using a different label. There is no intent to use the mark in the future.

## CONCLUSIONS OF LAW

A. *The Standard for Obtaining a Preliminary Injunction*

To obtain a preliminary injunction in a trademark infringement action,

> the moving party has the burden of showing " '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.' "

*Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985) (citations omitted).

■ The award of a preliminary injunction is an extraordinary and drastic remedy. Such a remedy will not be provided absent a clear showing that the movant has met its burden of proof. *See, e.g., Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801, 803 (2d Cir.1973); *Clairol, Inc. v. Gillette Co.*, 389 F.2d 264, 265 (2d Cir.1968); *Societe Comptoir De L'Indus. Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33, 35 (2d Cir.1962).

1. *Irreparable Harm*

" ' "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision

on the merits can be rendered." ' " *Citibank, supra*, 756 F.2d at 275 (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983) (in turn quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 431 (1973) (footnote omitted)).

■ Plaintiff argues that, in cases involving a "federally registered trademark, proof of a likelihood of confusion among ordinary purchasers establishes both the requisite threat of irreparable harm as well as a likelihood of success on the merits." P. Memo. at 6 (citing *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108, 1111–1112 (S.D.N.Y.1981); *Paco Rabanne Parfums v. Norco Enterprises, Inc.*, 680 F.2d 891, 893 (2d Cir.1982)). The Court, however, notes that a finding of likelihood of confusion does not inevitably compel a finding of irreparable harm. *Citibank, supra*, 756 F.2d at 275–76. Nevertheless, because plaintiff has failed to introduce any significant evidence regarding this threshold element of irreparable harm—independent of its "likelihood of confusion" argument—the Court will bypass this element and turn directly to the merits.[3]

2. *Likelihood of Success on the Merits*

■ In order to prevail on its claim of trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114, plaintiff bears the burden of proving that (i) it owns a valid trademark, and (ii) defendants' use of their trademark creates a "likelihood of confusion" as to the source of their goods. *See, e.g., C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 17 (2d Cir.1985); *Clairol, supra*, 389 F.2d at 265.

a. *The Validity of the Mark*

■ The threshold question, therefore, is whether plaintiff owns a valid trademark. It is undisputed that plaintiff owns a federal registration for certain items of athletic clothing. *See* P. Memo. at 8; D. Memo at 14. However, although federal registra-

---

**3.** Of course, in the event that the Court finds no "likelihood of confusion," plaintiff's claim of irreparable injury falls, as well.

tion of the mark is *prima facie* evidence of the validity of that mark, the presumption of validity is rebuttable and applies only to the mark as used on the clothing specified in plaintiff's registration. *See Flexitized, Inc. v. Nat'l Flexitized Corp.,* 335 F.2d 774, 779 (2d Cir.1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965); *Shaw-Barton, Inc. v. John Baumgarth Co.,* 313 F.2d 167 (7th Cir.), *cert. denied,* 374 U.S. 831, 83 S.Ct. 1873, 10 L.Ed.2d 1054 (1963); 15 U.S.C. § 1115(a). The defendants may "prov[e] any legal or equitable defense or defect which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a).

**b. *The Likelihood of Confusion***

■ Even assuming arguendo that Karmikel owns a valid trademark, Karmikel must still show that there is a "likelihood of confusion" in order to prevail. *See e.g., Pan American v. Panamerican School of Travel,* 648 F.Supp. 1026, 1032 (S.D.N.Y.), *aff'd,* 810 F.2d 1160 (2d Cir.1986) ("Exclusive ownership rights in a trade name do not automatically entitle the owner to protection in an infringement action."); *Simon Says Enterprises, Inc. v. Milton Bradley Co.,* 522 F.Supp. 986, 988 (S.D.N.Y.1981) ("The mere fact plaintiffs have a registered service mark on 'Simon Says' does not give them the right to absolute protection of the mark. To establish infringment under Section 32 of the Lanham Act, plaintiffs must basically show that the use of its mark by defendant creates a likelihood of confusion and also that a finding of infringement is favored by a balance of equities."); *Mother's Restaurants Inc. v. Mother's Bakery, Inc.,* 498 F.Supp. 847, 857 (W.D.N.Y.1980) ("Mere registration, however, does not give a party a right to the protection of its mark, which is left to resolution by the courts").

A determination of "likelihood of confusion" requires proof that "an appreciable number of reasonable consumers would be misled, or simply confused, as to the source of the goods in question." *C.L.A.S.S. Pro-*

*motions, supra,* 753 F.2d at 17 (citation omitted). The Second Circuit has stated that a plaintiff must demonstrate that a "significant number" of customers are likely to be misled. *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1138 (2d Cir. 1979). " 'The remote possibility of occasional confusion in those who observe less than ordinary care under the circumstances does not concern us. [Citation omitted]' ... ' "The purchasing public must be credited with at least a modicum of intelligence...." ' " *Id.* at 1138 (citation omitted).

In *Polaroid Corp. v. Polorad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), Judge Friendly set forth the following factors for evaluating whether a likelihood of confusion exists:

a. The strength of the plaintiff's mark;

b. The degree of similarity between plaintiff's and defendant's marks;

c. The proximity between the products involved;

d. The likelihood that plaintiff will "bridge the gap";

e. Actual confusion;

f. The defendant's intent in adopting its mark;

g. The quality of the defendant's products;

h. The sophistication of the consumer.

*Polaroid Corp., supra,* 287 F.2d at 495; *C.L.A.S.S. Promotions, Inc.,* 753 F.2d at 17; *see also Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 214 (2d Cir.1985) ("Although the *Polaroid* balancing test was traditionally confined to products that were 'non-competing,' [citation omitted], 'non-competitive,' [citation omitted] or 'different,' [citation omitted], it now properly extends to competing products.") (citations omitted).[4] "No single *Polaroid* factor is determinative. Rather each must be considered in the context of all of the other factors, and from a balance of these determinations, one is able to reach the ultimate

---

**4.** Plaintiff failed to address each element of the *Polaroid* test. In fact, plaintiff's papers are devoid of any mention of *Polaroid.* Apparently this is due to plaintiff's counsel's mistaken be-

lief, revealed at oral argument, that the *Polaroid* factors are not applicable to trademark cases involving allegedly competing goods.

conclusion, whether there is a likelihood of confusion between the two parties' products." *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir. 1983) (citations omitted).

Courts may also consider the following equitable factors regarding the question of likelihood of confusion: "the conflicting interests of the parties in continuing their trademark use ..." and " 'the nature of the senior user's priority, the senior user's delay in asserting its claim, and the harm to the junior user as compared to the benefit to the senior user that would result from the requested injunction.' " *Pan American, supra*, 648 F.Supp. at 1032–33 (quoting, in part, *Thompson Medical Co., supra*, 753 F.2d at 214) (citation omitted); *see also McGregor-Doniger, supra*, 599 F.2d at 1140; *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1553 (S.D.N.Y.1987) (Stanton, J.).

As Judge Stanton noted:

These factors organize analysis of the facts so as to give appropriate recognition to three interests which justify trademark protection covering non-identical products: *first*, the senior user's interest in being able to enter a related field at some future time; *second*, his interest in protecting the good reputation associated with his mark from the possibility of tarnish by inferior merchandise of the junior use; and *third*, the public's interest in not being misled by confusingly similar marks—a factor which may weigh in the senior user's favor where the defendant has not developed the mark himself. [Citation omitted]. Against the first two interest of the senior user is balanced the legitimate interest of an innocent second user.

*Edison Bros., supra*, 651 F.Supp. 1553–54 (citation omitted) (emphasis in original). The Court will now apply the aforementioned factors to the instant dispute.

### 1. *Strength of Plaintiff's Mark*

"The distinctiveness of a mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular (even though anonymous) source, determines the mark's strength or weakness." *Edison Bros., supra*, 651 F.Supp. at 1554 (citing *McGregor-Doniger, supra*, 599 F.2d at 1131). Courts look to two factors to determine the relative strength of a mark: "(1) the placement of the mark on the spectrum of marks; and (2) the marketplace recognition value of the mark. The first factor identifies the inherent potential of the mark at the time of its first use. The second describes its actual consumer recognition value at the time registration is sought, or at the time it is asserted in litigation to prevent another's use." *Edison Bros., supra*, 651 F.Supp. at 1554 (citing 1 McCarthy, *Trademarks and Unfair Competition*, § 11.25, pp. 509–510 (2d ed. 1984); *McGregor-Doniger, supra*, 599 F.2d at 1131–33; *Plus Products, supra*, 722 F.2d at 1005–1006).

■ In order to determine the "distinctiveness" of a mark, the courts divide trademarks into four categories: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *McGregor-Doniger, supra*, 599 F.2d at 1131; *see also 20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 87 (2d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). A generic term "refers ... to the genus of which the particular product is a species" and is not entitled to legal protection or trademark registration. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). A descriptive mark is one which "forwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Stix Products, Inc. v. United Merchants & Mfrs. Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y. 1968) (citations omitted). "Descriptive marks, like generic ones, are considered inherently weak and may be protected or registered only upon a showing of 'secondary meaning'." *Edison Bros., supra*, 651 F.Supp. at 1554 (citing *McGregor-Doniger*, 599 F.2d at 1131).

"A suggestive mark has not been clearly defined, [citation omitted], but appears to be one that 'require[s] imagination, thought and perception to reach a conclusion as to the nature of the goods', [citation omitted], or one which only 'indirectly' describes the goods or services at issue...." *Edison*

Bros., supra, 651 F.Supp. at 1554 (citation omitted). "An arbitrary or fanciful mark is a term having no association with the particular product or service, [citation omitted], such as 'Kodak' for photographic equipment. Marks in these last two categories may be registered without proof of secondary meaning." Id.

■ Plaintiff, in its written submission to the Court, failed completely to discuss where plaintiff's mark fell on the aforementioned continuum. In contrast, defendants argue that plaintiff's mark, "Fast Track", as applied to athletic clothing clearly is "descriptive." As previously defined, a descriptive mark is one which describes the intended purpose, function or use of the goods. Plaintiff's principal, Robert Phillips, who developed "Fast Track" testified at his deposition that, in developing a trademark, he attempts "to associate the words with the product I am looking to develop and sell" and that he associated the "Fast Track" mark, which is used on jogging clothes, with "joggers running on a nice track." Phillips Dep. at 20–21.

At oral argument plaintiff's counsel asserted that "Fast Track" was at least a "suggestive" mark and, in his opinion, most likely an "arbitrary" or "fanciful" mark. Plaintiff's counsel's reasoning was as follows: clothing cannot evoke a track; clothing cannot evoke speed. Therefore, the trademark "Fast Track" could not possibly describe clothing, even athletic clothing commonly used for running and jogging, often on fast running tracks.

There is no question that "[m]aking such a determination—pigeonholing or labeling—has always been a slippery business...." 20th Century Wear, supra, 747 F.2d at 87 (citations omitted). Moreover, the distinction between suggestive and descriptive terms is one "that the courts have had great difficulty" in drawing. Abercrombie & Fitch, 537 F.2d at 10. However, pursuant to the standard stated above, this Court finds that the mark "Fast Track" is descriptive. The Court's finding is based on the deposition testimony of Mr. Phillips, as well as this Court's conclusion that " 'the consumer understands [the] significance [of the mark "Fast Track" in the context of jogging and athletic wear] with-

out any exercise of the imagination....' " 20th Century Wear, supra, 747 F.2d at 88 (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies, § 1805 at 17 (L. Altman 4th ed. 1983)).

Again as previously noted, descriptive marks are considered inherently weak. McGregor-Doniger, supra, 599 F.2d at 1131; see also Shaw-Burton, Inc., supra, 313 F.2d at 169 ("It is well established that where descriptive words are used, the presumption of validity attaching to a registered trademark may be easily overcome.") (Citation omitted). Plaintiff may overcome the conceptual weakness of the "Fast Track" mark by presenting evidence of "secondary meaning," that consumers associate plaintiff's mark with a particular source of the goods. Again, plaintiff has completely failed to introduce any evidence that its mark has attained a secondary meaning. See C.L.A.S.S. Promotions, supra, 753 F.2d at 16 ("a descriptive mark which has no secondary meaning cannot be a valid trademark.")

■ Plaintiff has presented no evidence that actual or potential customers associate the "Fast Track" mark with plaintiff. See C.L.A.S.S. Promotions, 753 F.2d at 17–18. Plaintiff has failed to introduce evidence regarding whether it promotes consumer or trade recognition of its mark. Plaintiff does not advertise and there is no evidence that any store advertisements have displayed plaintiff's "Fast Track" mark. Phillips Dep. at 56–58. Plaintiff also does not use catalogues or brochures in marketing its merchandise to the trade. Phillips Dep. at 67. See Edison Bros., 651 F.Supp. at 1555 (plaintiff's mark is weak because, among other things, its shops "have never advertised or otherwise promoted NOTORIOUS clothing.") In any event, plaintiff's only emphasis in its marketing efforts—to the extent one has been brought to this Court's attention—is that plaintiff's products are manufactured in the United States. Defendants argue, however, that there are many companies that emphasize the domestic origin of their goods. Moreover, the domestic origin of plaintiff's

clothes is in no way related to the theme of plaintiff's mark.

Mr. Phillips concedes that plaintiff's mark is not even publicized to purchasers at retail points of purchase. The only possible visible sign of the mark at the time of consumer purchase is on a small label sign inside the clothing. *See* Phillips Dep. at 66–67; *see* Siroky Aff.Ex. 1. Moreover, the mark does not appear on hang tags or other removable tags, nor does it appear on the polyethylene bags in which the clothes are sold and displayed at retail. Phillips Dep. 66–67; Siroky Aff.Ex. 9. Finally, the Court notes that because the mark is displayed only on a label affixed to the *inside* of the clothing, the mark is not visible when worn. Thus, unlike many designer marks—which are placed on the outside of a number of items, including clothing—plaintiff's mark, placed on the inside of the apparel, cannot be associated with the appearance of the clothing itself. Plaintiff, therefore, fails to utilize yet another tool available for gaining consumer recognition of its mark.

Defendants also argue that plaintiff cannot demonstrate that it promotes its "Fast Track" mark to the trade as a source identifier. In fact, the evidence indicates that plaintiff uses its trademarks interchangeably on identical garments. *See* Kornstein Aff. at ¶¶ 5–7; Carter Aff. at ¶¶ 5–6; Huff Aff. at ¶ 3; Smasal Aff. at ¶ 4; Phillips Dep. at 36. Rather than using the "Fast Track" mark to identify some of its particular products, plaintiff, on more than one occasion, allowed precisely the same goods to bear one of plaintiff's labels in one year and a different label the next.[5]

In addition, defendants point out that plaintiff's sales sheets and invoices indicate that plaintiff never describes its clothing by reference to the "Fast Track" mark. Instead, plaintiff identifies its products by style numbers. *See* Kornstein Aff. at ¶ 5; Carter Aff. at ¶ 6; Huff Aff. at ¶ 3; Smasal Aff. at ¶ 4; Phillips Dep. at 25–26, 67; Siroky Aff.Exs. 10–12. Also plaintiff often describes its clothing to its customers by reference to other producers' trademarks, for example "LaCoste," "Allen Solley" shirts and "Adidas-look." Phillips Dep. at 27; Siroky Aff.Ex. 10. Furthermore, although plaintiff's sales sheets, invoices and letterhead include the "Fast Track" mark, these forms also display with equal prominence other trademarks used by plaintiff, for example "tops too" and "On Stage," along with plaintiff's corporate name and mailing address. *See* Siroky Exs. 10–13.

The aforementioned facts indicate that plaintiff does not, in the ordinary course of its business operations, place a great emphasis on its "Fast Track" mark. "When the user of a mark exhibits so little regard for it, it is difficult to avoid the inference that the mark means little to others." *Vitarroz v. Borden, Inc.*, 644 F.2d 960, 968 (2d Cir.1981). In the instant case, such an inference is given direct support by the fact that only two purchase orders, from only one customer, produced by plaintiff, refers to the "Fast Track" mark. In contrast, ten other purchase orders describe plaintiff's "Fast Track" products by reference to third-party trademarks, such as "LaCoste." The rest of the orders refer solely to style numbers and product descriptions. *See* Siroky Aff.Exs. 14–16.

---

5. As Jerry W. Carter, the Buyer of Men's Dress Shirts and Furnishings of the O'Neil's Department Store stated:

When I placed O'Neil's initial order for goods with Karmikel, Karmikel offered to put our choice of any one of three or four labels in the garments we purchased.... I do recall that in one instance we learned that one of our competitors in the Akron, Ohio area was selling Karmikel goods like ours under another of Karmikel's labels.

Carter Aff. ¶ 5. Similarly Timothy R. Smasal, the Buyer for men's tailored separates, pants and jeans for the Famous Barr store in St.

Louis, noted that "there was no consistency between Karmikel's style numbers and labels. In other words, a certain style number would arrive from Karmikel with different labels, even within the same season." Smasal Aff. ¶ 4. Finally, Michael A. Kornstein, the Branch Merchandise Manager of the Hecht Company Department Store, agreed that "Karmikel used different labels on the same goods from season to season based on what Karmikel had available. It was not unusual for the same goods to bear one label one season or year and a different label the following season or year." Kornstein Aff. at ¶ 6.

In addition to plaintiff's and its customers' low regard for the "Fast Track" mark, plaintiff's claim of infringement is further weakened because the words "Fast Track" are an every day expression used in ordinary conversation. *See Pan American, supra,* 648 F.Supp. at 1033–34 (plaintiff's trademark weak because "it is a use of words of our general vocabulary which others should be free to use to describe their products or services...."); *see also Societe Comptoir, supra,* 299 F.2d at 36 ("The registering of a proper noun as a trade-mark does not withdraw it from the language, nor reduce it to the exclusive possession of the registrant which may be jealously guarding against any and all use by others.") [6]

In sum, Karmikel has never advertised or otherwise promoted "Fast Track" clothing. Plaintiff has failed to produce any evidence that its customers recognize "Fast Track", or that the mark plays any role in their selection of these products. Therefore, because plaintiff has failed to demonstrate that its descriptive mark "Fast Track" is "widely recognized in the marketplace [and because 'Fast Track'] cannot be deemed particularly strong commercially, or analogous to the famous 'designer' trademarks ...", *Edison Bros., supra,* 651 F.Supp. at 1555, the Court concludes that the "Fast Track" mark is extremely weak.

### 2. *Similarity Between the Marks*

"In determining similarity between the marks in question, the focus is 'the general impression conveyed by the two marks', and similarity is relevant only insofar as it confuses prospective purchasers." *Id.* (quoting *McGregor-Doniger,* 599 F.2d at 1137). "Even close similarity between two marks is not dispositive of the issue of likelihood of confusion. Rather, the similarity must be assessed in terms of its effect upon prospective purchasers...." *Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251, 257 (2d Cir.1982) (citation omitted). " '[I]t is sufficient if the impression which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trade-mark.' " *McGregor-Doniger,* 599 F.2d at 1134 (citation omitted) (quoting *Stix Products, supra,* 295 F.Supp. at 494).

"Similarity, for these purposes, is a functional test which must include 'all the factors that could reasonably be expected to be perceived by and remembered by potential purchasers' to determine whether it 'is likely to provoke confusion.' " *Edison Bros.,* 651 F.Supp. at 1555 (quoting *McGregor-Doniger, supra,* 599 F.2d at 1133). The courts should "consider both the similarity of the names and the manner of their presentation to the public." *Edison Bros., supra,* 651 F.Supp. at 1555.

First, the character of the marks must be considered. Karmikel's mark "Fast Track" and defendants' mark "Fast Trak" are phonetically identical. In addition, plaintiff argues that the marks "convey the identical connotations when used on the sportswear sold by the respective parties." P. Memo. at 7. Thus, to this extent, there is no dispute between the parties that the marks are similar. Even a cursory examination of the marks, however, reveal substantial differences. For example, while plaintiff's "Fast Track" words are covered with a bright red design, defendants' "Fast Trak" words are printed in large plain, black block letters. Furthermore, while the words "Fast Track" are slanted on an angle and are bisected by horizontal lines, the words "Fast Trak" are horizontal, and are not slanted or divided. These additional features of the marks are at least as dis-

---

**6.** Defendants have also provided evidence gleaned from a trademark search indicating that there are 61 trademark registrations for various forms of the words "Fast Track" used in connection with a variety of products and services. *See* Siroky Aff.Ex. 17. The search also shows that there are also 1235 registrations for the marks "Fast" and "Track". *Id.* Plaintiff's counsel, at oral argument, objected to the Court's consideration of this evidence. The Court will honor plaintiff's request because, in part, this Court does not deem the trademark search evidence necessary in order to deny plaintiff's motion for preliminary injunction. However, the Court notes that, in general, third-party registrations are highly probative evidence that the public considers such marks to be weak and descriptive. *See Pan American, supra,* 648 F.Supp. at 1033.

tinctive as the words themselves. Moreover, the "potential for confusion is reduced [because of] the differing contexts in which the marks are presented." *Edison Bros., supra,* 651 F.Supp. at 1555–56 (citations omitted); *see also C.L.A.S.S. Promotions,* 753 F.2d at 18 ("The court carefully contrasted the size, layout, design, and logotype of the two titles and found that the differing presentations of the marks reduced the potential for confusion.") (footnote omitted); *Edison Bros., supra,* 651 F.Supp. at 1556 ("Differences in the typeface of the marks are considered in determining the similarity between the two.... This difference serves to distinguish the marks visually."); *Pan American,* 648 F.Supp. at 1035 (marks using same words but different designs not confusingly similar). Therefore, it is reasonable to conclude that the general impressions created by the two marks are different and do not support a finding of confusion.

The Court notes that, although plaintiff is aware that the proper standard is whether the marks create the same overall impression, plaintiff merely points out the phonetic similarity between the marks and then asserts that the marks convey an identical connotation. Plaintiff fails completely to address the aforementioned differences between the marks' physical appearances. Plaintiff's failure is particularly noteworthy in light of the fact that the products, marketed under the trademarks here in dispute, are sold off-the-rack and thus, are chosen by an individual customer, rather than sold from behind a counter and requested by name from a sales person. *See Spangler Candy Co. v. Crystal Pure Candy Co.,* 235 F.Supp. 18, 22 (N.D.Ill.1964), *aff'd,* 353 F.2d 641 (7th Cir.1966).

### 3. *Proximity of the Products*

■ The proximity of the products bearing the marks "Fast Track" and "Fast Trak", respectively, is another factor relevant to the likelihood of confusion. "The degree to which consumers are likely to be confused about the sources of the product

depends somewhat on their competitive closeness." *Edison Bros., supra,* 651 F.Supp. at 1556. Plaintiff argues that it has applied the "Fast Track" mark "to a full line of boy's and young men's athletic wear or sportswear including sweatsuits, jogging shorts, and sport shirts." P. Memo. at 8. Plaintiff also points out that defendants have applied their "Fast Trak" mark to "young men's and boy's sportswear including tops, walking shorts, swimwear, and 'fleece' outerwear (i.e. sweat shirt jackets)." *Id.* However, as a threshold matter, plaintiff's comparison either carelessly ignores or disingenuosly obscures the fact that its registration applies only to four specific types of athletic clothing and not to the broad range of clothing that plaintiff sells.

Plaintiff also argues that, as a general matter, its products and that of defendants are sold in similar channels of trade. Plaintiff contends that both its and defendants' products are directed towards the same age groups—young men and boys; and that, generally, the products are used by these age groups for the same purposes. Again, however, closer analysis reveals the shortcomings of plaintiff's position, at least on the present record.

First, defendants argue that the quality and styling of defendants' products are superior to plaintiff's. *See* Boyson Aff. at ¶ 21. Moreover, defendant points out that although the products are both directed towards leisure wear, plaintiff's goods are primarily designed for the athletically-oriented consumer.[7] Defendants' products, in contrast, consist primarily of general leisure and casual wear. Moreover, as has been previously discussed, plaintiff's products are not advertised, marketed or displayed to promote the "Fast Track" mark.

More significant for the instant action, however, is a comparison of the outlets where the goods are sold. Defendants' products are sold in "upstairs" departments and are directed to attract more upscale, fashion-conscious customers. On

---

7. In fact, plaintiff is specifically required by its registration to use its mark solely on specific athletic clothing. *See* Siroky Aff.Ex. 7.

the other hand, plaintiff's clothing is sold in budget and discount stores to customers motivated by price, not fashion. *See* Boyson Aff. at ¶¶ 5, 7; Rothman Aff. ¶¶ 4–7; Lohman Aff. ¶ 5; Allen Aff. ¶¶ 3–4; Kornstein Aff. ¶¶ 2–4; Carter Aff. ¶ 2; Huff ¶ 2; Smasal Aff. ¶ 2; *see also* Phillips Dep. at 75, 79, 83, 86.

Plaintiff, anticipating defendants' "channel-of-trade" argument, insists that "[i]t matters not that the respective goods may have been present in different sections of May's stores in the past...." In fact, plaintiff argues that "this factor mitigates in *favor* of the requested relief ... [because] the realities of consumer purchasing habits ... no doubt include ventures both into the upstairs section as well as into the downstairs section of May's stores in search of value-priced young men's and boy's clothing." P. Memo. at 9. Moreover, plaintiff asserts that "the ['Fast Trak'] goods sold by the defendants are in the identical 'value-priced categories of merchandise." *Id.* (citing Deposition of Gary R. Boyson, dated March 20, 1987 at 165–167).

Despite the superficial appeal, at least to plaintiff, of this last argument, it is not supported by the law of this Circuit. *See, e.g., Vitarroz, supra,* 644 F.2d at 967 (found no likelihood of confusion between plaintiff's mark "Bravo's" and defendant's mark "Bravos" in part because "[w]ithin retail food stores, the record shows that the products are shelved in different sections whenever space permits ..."). In addition, the evidence in the record also fails to support its position. Indeed, the evidence indicates that it is more likely than not that customers looking for bargains at discount stores are less quality conscious and less likely to be attracted to higher priced merchandise in more fashionable departments. *See* Boyson Aff. at ¶ 7; Rothman Aff. at ¶¶ 4–6; Kornstein Aff. at ¶ 2; Carter Aff. at ¶ 2. More importantly, plaintiff has offered no evidence that the same consumer shops at both types of stores and would be faced with the two allegedly competing lines of clothes. The Court reminds plaintiff that it bears the burden of proof on the instant motion.

Therefore, on balance, although the Court is willing to find that Karmikel's clothes and the defendants' clothes are somewhat close, and therefore, raise a *slight* possibility of public confusion, nevertheless, the present record is inadequate to establish such a degree of proximity as to be of any significance in the instant case.

### 4. *Likelihood that Karmikel Will Bridge the Gap*

▉▉▉ The likelihood that Karmikel will "bridge the gap" to sell higher-quality or higher-priced goods in non-discount stores "bears upon both the likelihood of confusion and the equities of the case." *Edison Bros., supra,* 651 F.Supp at 1558. "Bridging the gap" refers to two different scenarios:

The first is that the senior user presently intends to expand his sales efforts to compete directly with the junior user; likelihood of confusion is created by the likelihood that the two products will be directly competitive. The second possibility is that, while there is no present intention to bridge the gap, consumers will assume otherwise and conclude, in this era of corporate diversification, that the parties are related companies.

*Lambda Electronics Corp. v. Lambda Tech., Inc.,* 515 F.Supp. 915, 926 (S.D.N.Y. 1981) (citing *McGregor-Doniger, supra,* 599 F.2d at 1135–36). "Such an intention would increase the likelihood of confusion, and, as the trademark laws protect 'the senior user's interest in being able to enter a related field at some later time,' *Scarves by Vera [v. Todo Imports Ltd. (Inc.),* 544 F.2d 1167, 1172 (2d Cir.1976)], it is an equitable factor supporting [Karmikel's] claim for relief." *Edison Bros., supra,* 651 F.Supp. at 1558 (citing *Lambda Electronics, supra,* 515 F.Supp. at 928). Such a desire on the part of the senior user to bridge the gap "creates an independent potential for confusion." *Edison Bros., supra,* 651 F.Supp. at 1558.

Plaintiff has failed completely to address this element of the *Polaroid* test. Moreover, defendants note that "[p]laintiff prides itself on selling low-priced, Ameri-

can-made goods in discount stores. Thus, it is highly unlikely that plaintiff will 'bride the gap' to sell higher-quality or higher-priced goods in non-discount stores." D. Memo. at 31. Moreover, defendants also point out that because they "are discontinuing their 'Fast Trak' label, there will be no possibility of confusion in the future even if plaintiff 'bridges the gap.'" Therefore, this element of the *Polaroid* test further weakens plaintiff's position.

### 5. *Actual Confusion*

█ "No evidence of actual confusion is required in order to prove a likelihood of confusion." *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1024 (7th Cir.), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1979) (citations omitted). "However, since [Karmikel's] mark is not particularly strong, such evidence would aid [Karmikel] in demonstrating that the public is likely to confuse it with the source of [May's] products." *Edison Bros., supra*, 651 F.Supp. at 1558. Here, plaintiff concedes that there has not been a single occurrence of actual confusion. *See* Phillips Dep. at 143–44; P. Memo. at 17. This despite the fact that plaintiff and defendants have been selling their goods concurrently for two years.

"Evidence of actual confusion strongly indicates the likelihood of confusion." *Edison Bros., supra*, 651 F.Supp. at 1558 (citations omitted). "'Although evidence of actual confusion is not essential to a finding of trademark infringement, there can be no more positive proof of likelihood of confusion than evidence of actual confusion.'" *Lambda Electronics, supra*, 515 F.Supp. at 926 (citation omitted). "Similarly, the absence of actual confusion may indicate that there is no likelihood of confusion." *Edison Bros., supra*, 651 F.Supp. at 1558 (citation omitted). The Court here finds that two years of concurrent use of the marks without any instance of actual confusion is a "strong indicator that the likelihood of confusion is minimal." *Plus Products, supra*, 722 F.2d at 1006 (citations omitted).

█ Plaintiff argues that, although there is no evidence of actual "consumer confusion," it claims that there is a sub-stantial likelihood of such confusion because plaintiff has sold its goods to numerous stores owned by May. Moreover, plaintiff suggests that the reason several May Budget Stores—which had purchased "Fast Track" merchandise from plaintiff in the past—"abruptly" ceased these purchases in 1985, was because these stores alleged recognized the conflict between Karmikel's rights in "Fast Track" and May's rights in "Fast Trak." Not only is this argument barely tenable, based on the evidence proffered by plaintiff, but such sheer speculation is certainly inadequate to persuade this Court to grant the extraordinary remedy of a preliminary injunction.

### 6. *Defendants' Intent in Adopting Its Mark*

"In trademark infringement actions this equitable factor looks to whether the defendant[s] adopted [their] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [their] and the senior user's product." *Edison Bros., supra*, 651 F.Supp. at 1560 (citing *McGregor-Doniger*, 599 F.2d at 1137; *Spring Mills v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1134–36 (2d Cir.1982) (defendant's choice of ULTRACASHMERE trademark and copying of the hang tag were blatant acts of trade piracy); *Procter & Gamble [v. Johnson & Johnson*, 485 F.Supp. 1185, 1201 (S.D.N.Y.1979), *aff'd mem.*, 636 F.2d 1203 (2d Cir.1980)]). "If the junior user has 'adopted the mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement.'" *Edison Bros., supra*, 651 F.Supp. at 1560 (quoting *Narwood Productions [v. Lexington Broadcast Services Co.*, 541 F.Supp. 1243, 1252 (S.D.N.Y. 1982)]; *see also Lambda Electronics, supra*, 515 F.Supp. at 929). In the absence of any evidence suggesting the presence of these motives, courts usually find that the defendants acted in good faith. *See Del Laboratories, Inc. v. Alleghany Pharmacal Corp., supra*, 516 F.Supp. 777, 784 (S.D.N.Y.1981).

█ Plaintiff argues that defendants acted with "gross recklessness" in adopt-

ing their mark and so they should be enjoined from using their "Fast Track" mark P. Memo. at 10. However, as defendants point out, "recklessness" is not a relevant factor. *See* D. Memo. at 34. Instead, the Court must ask whether defendants intentionally copied or simulated plaintiff's mark in order to benefit from the reputation of the trademark owner. *See, e.g., McGregor-Doniger Inc.,* 599 F.2d at 1137; *Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.,* 308 F.2d 196, 199 (2d Cir.1962).

Plaintiff has failed to introduce any evidence that defendants had actual notice of Karmikel's registered trademark. Moreover, even plaintiff's claim that defendants had constructive notice of Karmikel's mark "is not necessarily evidence of bad faith. To the contrary, [as this Court has previously noted,] prior use of a trademark does not automatically entitle the first user to bar [the mark's] use by others." *Edison Bros., supra,* 651 F.Supp. at 1560 (citations omitted).

■ More significant, for the analysis of this element of the *Polaroid* test, is whether defendants were or are seeking to capitalize on goodwill obtained by Karmikel through the use of its "Fast Track" mark. Plaintiff, however, argues only that defendants, in adopting their "Fast Trak" mark, "either knew of plaintiff's dominant rights or were totally indifferent thereto...." P. Memo. at 12. While spending an inordinate amount of effort detailing defendants' alleged carelessness in their trademark search, plaintiff fails to suggest to the Court how defendants seek to benefit from any confusion between their products and that of plaintiff. From the record, the Court can only conclude that defendants did not intend to trade on any association with plaintiff's mark. "Nor has [Karmikel] established the sort of extensive reputation and goodwill for its mark that would attract a trademark infringer interested in a free ride." *Edison Bros., supra,* 651 F.Supp. at 1561.[8]

The Court, of course, notes that extreme recklessness on the part of defendants and evidence that they have exhibited a "cavalier and arrogant attitude toward the rights of the plaintiff" suggests bad faith. P. Memo. at 16–17. However, in light of the Court's previous findings regarding the other factors of the *Polaroid* test, the mere possibility of carelessness on the part of defendants does not persuade the Court to grant plaintiff a preliminary injunction.

### 7. *The Quality of Defendants' Product*

■ "Inferior quality is a factor entitling the senior user to protection of 'the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise.'" *Edison Bros., supra,* 651 F.Supp. at 1561 (quoting *Scarves by Vera, supra,* 544 F.2d at 1172). Accordingly, "where the junior user's product is of inferior quality, the senior user has an interest in enjoining the junior user from using the mark, and thus avoiding the risk that the public's perception of his product will suffer from confusion between himself and the junior user." *Edison Bros., supra,* 651 F.Supp. at 1561 (citations omitted).

Plaintiff does not claim that its merchandise is superior to May's. In fact, the evidence produced on this point indicates that defendants' goods are superior to those of plaintiff. Therefore, defendants argue that "[c]onfusion between defendants' and plaintiff's goods ... might enhance, but would not tarnish, plaintiff's reputation." D. Memo. at 39. At oral argument, plaintiff again conceded that it did not claim that its goods were superior to defendants'; however, plaintiff did not concede that its goods were inferior to those of defendants. In any event, plaintiff is not directly concerned with its reputation being tarnished because of the quality of defendants' goods, but rather because of the foreign origin of defendants' apparel.

Plaintiff claims that its reputation as a vendor of American-made products will be

---

**8.** Moreover, in light of the evidence provided by defendants regarding the autonomy of May's Merchandising and the independent operation of the various May Merchandising divisions, it is not beyond belief that the personnel respon-

sible for developing the "Fast Trak" mark would have been unaware of May's Bargain Stores experience with "Fast Track" merchandise sold by Karmikel.

damaged because its mark will become associated with a mark placed on imported goods. Defendants do not directly address this point. However, suffice it to say—for the purposes of the instant motion—that the Court's earlier findings regarding the limited potential for likelihood of confusion between plaintiff's and defendants' marks, the lack of actual confusion demonstrated by plaintiff, as well as the other *Polaroid* factors discussed *supra,* are dispositive of plaintiff's argument.

### 8. *The Sophistication of the Consumer*

■ "In determining the likelihood of confusion, the court chould consider the level of sophistication of the relevant purchasers." *Edison Co., supra,* 651 F.Supp. at 1561. In evaluating this element, the Court should look at:

> The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods....

*McGregor-Doniger, supra,* 599 F.2d at 1137. Price is usually a helpful guideline for assessing the care and thought put into a purchase:

> [E]very product has its own separate threshold for confusion of origin. The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt pay more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine.

*McGregor-Doniger, supra,* 599 F.2d at 1137. Similarly, the extent of reliance by consumers on labels will also vary depending on the product in question. *Id.*

Plaintiff completely ignores this final element of the *Polaroid* test. Defendants argue that this element also militates in favor of defendants. "First, as to plaintiff's direct buyers, retail stores, these are sophisticated, professional buyers who are not likely to be confused between two marks. In addition, since defendants' mark is used solely as a private label, defendants' immediate customers will never be confronted with defendants' mark when making purchasing decisions." D. Memo. at 39. With respect to the ultimate consumers—shoppers for boys' and young men's clothing—defendants assert, without contradiction by plaintiff, that the "primary shoppers" for this "clothing are mothers who ordinarily exercise a higher degree of care in selecting clothes for their youngsters and are specially attentive shoppers since they are concerned with purchasing clothing that will survive their sons' rough and tumble use of the garments." *Id.* Therefore, "[a]lthough the garments in question are relatively low-priced items, such clothing is not purchased impulsively." *Id.* at 39–40.

Defendants also assert that "consumers of low-priced products sold in discount stores are not brand-name conscious. Instead they are seeking the lowest prices and not particular brand names." *Id.* at 40. Moreover, defendants claim that because the evidence indicates that "upstairs purchasers" do not visit discount outlets and vice versa ... [t]o the extent that these groups of customers restrict their shopping to high priced or low priced departments or stores, the factor of customer sophistication is irrelevant since they will not encounter the other level of goods." *Id.* To the extent plaintiff responds to defendants' last argument, it is limited to plaintiff's contention that there is no evidence that shoppers do not patronize both "upstairs" and discount vendors. Plaintiff, however, is the movant; the burden of proof remains with it to show that shoppers do patronize both upstairs and downstairs departments. Plaintiff has failed to do so.

### CONCLUSION

For the aforementioned reasons, the Court holds that plaintiff has failed to show that, in the absence of this Court granting it a preliminary injunction, plaintiff will suffer irreparable harm. Moreover, plaintiff has failed to establish a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litiga-

tion. Therefore, plaintiff's motion for a preliminary injunction is denied.[9]

SO ORDERED.

---

**9.** For the reasons stated herein, the Court does not reach the question of whether the balance of hardships tip decidedly toward the plaintiff. However, the Court notes that on the present record, it appears that the equities favor defendants.