Agatha Ann BROWN and Agatha
Brown, Inc., Plaintiffs,

v.

Michel QUINIOU d/b/a
Agatha, Defendant.

No. 87 Civ. 8731 (JFK).

United States District Court,
S.D. New York.

Aug. 1, 1990.

---

Kirschstein, Kirschstein, Ottinger & Israel, New York City, for plaintiffs; Martin Schiffmiller, of counsel.

Liddy Sullivan Galway Begler & Peroff, New York City, for defendant; Jay H. Begler, Andrew V. Galway, Arlana S. Cohen, Nancy J. Deckinger, Elliot Jay Burko, of counsel.

## OPINION AND ORDER

KEENAN, District Judge:

Plaintiffs, a professional fashion designer and her company, bring this action alleging trademark infringement in violation of section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), false designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); common law trade name infringement and unfair competition; and violation of New York's "anti-dilution" statute, N.Y. General Business Law § 368–d (McKinney 1984). Plaintiffs seek an order granting summary judgment in their favor on each of their claims, a permanent injunction restraining defendant from using the name and mark AGATHA in connection with his products, and referral of the case to a magistrate to determine the appropriate amount of damages owed plaintiffs. In opposing plaintiff's application, defendant seeks Rule 11 sanctions. For the reasons developed below, the Court denies all motions.

## FACTS

Plaintiff Agatha Brown ("Agatha") has identified herself, her design services and a variety of products in the clothing and accessories field for over 35 years with the

name and trademark AGATHA or variations thereof. She owns five federal registrations for the trademark AGATHA and certain variations, including AGATHA BROWN, AGATHA B. and AGATHA KNITS, for various clothing products, scarves and belts. Plaintiffs maintain that Agatha chose to identify her products with her first name, which she submits is rare and distinctive in the United States, because her surname is quite common.[1] Plaintiffs bolster this assertion by declaring that "Agatha has never met another designer known simply as 'Agatha.'" Agatha Decl. ¶ 6.

There can be little dispute that Agatha has had a successful designing career and enjoys a fine reputation in that industry. Since 1954, while basing herself in New York, Agatha has worked for numerous well-known manufacturers of designer apparel and accessories. Indeed, after 1967, many of the companies or divisions for which Agatha designed products were renamed to feature her name as the companies' operating name and principal label. For example, in 1968 Agatha led a division of Milton Thayer Industries named "Giancarlo by Agatha," which marketed designer knitwear and scarves, belts and costume jewelry. Much of the jewelry marketed by that company bore the mark AGATHA. Agatha entered into similar agreements with other manufacturers through 1981. Under these agreements, Agatha typically would design clothes and accessories collections for companies or divisions and the goods would be marketed and advertised as "[ ] by Agatha" or "Agatha for [ ]."

Exhibit E to the Agatha declaration compiles various advertising and promotional materials, as well as press releases and articles concerning Agatha's design work and collections. The Court observes that the journalistic pieces consistently identify Agatha as "Agatha Brown" while the advertisements refer variably to "Agatha Brown," "Agatha," or "Agatha" accompanied by a prepositional phrase. The items firmly establish Agatha as an accomplished designer of clothes, particularly knitwear, but do not include a single reference to Agatha as a jewelry designer.

In 1983, Agatha created her own designer apparel and accessories company, named Agatha Brown, Inc. In February of that year, Agatha granted the company a worldwide exclusive right in her trademark AGATHA with respect to all products manufactured by the company, including jewelry and fragrances. Agatha Brown, Inc. manufactured a designer collection of women's apparel and accessories such as scarves and belts for over five years under five registered trademarks: AGATHA BROWN, AGATHA KNITS, AGATHA B. and two AGATHA marks. Plaintiffs attest that this venture was successful, earning between $3.5 million and nearly $5 million in each of three one-year periods.

Agatha Brown, Inc. promoted its product lines fairly vigorously. For example, the company conducted between thirty and fifty trunk shows a year in specialty stores across the country. Agatha herself attended many of these shows "and observed the extensive publicity of the AGATHA name and marks ... including print and broadcast media coverage in many instances." Agatha Decl. ¶ 21. Exhibit H to the Agatha declaration assembles media coverage, mostly in *Women's Wear Daily*, and advertisements for Agatha Brown, Inc.'s products. This material underscores again Agatha's prominence as a clothes and accessories designer, but in no way indicates that Agatha Brown, Inc. marketed jewelry or fragrances.[2]

---

1. Cervantes observed that "a good name is better than great riches." *Don Quixote*, Pt. ii, ch. 33 (1615). Judging from their submissions, it appears the parties would modify this adage to read: "a distinctive name is critical to commercial success." Derived from the Greek "agathos," meaning "good" or "brave," Agatha as a female given name appears in *Webster's Dictionary* and *American Given Names* (1979). In the 1988 edition of *Consumer Guide: Unusual &*

*Most Popular Baby Names,* Agatha ranked in the 10th percentile of least popular names. It is, however, more popular than, for example, Bertha, Hortense, Ida, Irma, Elvira, Maude, Beatrice, Madge, Edith and Sybil.

2. The same may be said concerning Exhibit L to the Agatha declaration, which is a videocassette of portions of the 1986 Dallas Mart trade show. In a segment honoring Agatha as the show's

In preparation for her Fall 1988 collection, Agatha decided to expand her selection of products to include costume jewelry and cosmetics. Specimens of each are included in Exhibits M and N, respectively, to the Agatha declaration. Agatha has an application pending in the Patent and Trademark Office for registration of the mark AGATHA in connection with jewelry products, cosmetics and handbags.

Defendant is a French citizen and businessman residing in Paris. He owns an international chain of AGATHA jewelry stores, 48 of which are in France. Although no one in defendant's family is named Agatha, he selected the name for his shops because it has a "good sound." Quiniou Dep. at 7. Defendant's AGATHA shops comprise one of the largest and most successful chains of jewelry stores in France.

Defendant decided in October 1985 to enter the United States market with his AGATHA stores and products. After some preliminary market research, in February 1986 defendant filed an application for registration of the mark AGATHA in the United States Patent and Trademark Office. The application was based on a prior registration of the mark in France in 1984. *See* 15 U.S.C. § 1126(e). Both the French registration and the United States application listed jewelry, horological instruments (watches and clocks), trunks and travelling bags, fancy leather goods and clothing as the goods for which registration was sought.

On April 24, 1986 the Patent and Trademark Office mailed an office action (an official response to the trademark application) to Quiniou's attorneys, rejecting the application in view of three registrations owned by plaintiff Agatha—registrations for the mark AGATHA (in connection with apparel design services), AGATHA KNITS (in connection with clothing) and AGATHA BROWN (also in connection with clothing). Defendant's receipt of this information represented the first time he ever heard of Agatha or her products.

On July 30, 1986 Agatha's attorney wrote to defendant's counsel demanding that Quiniou withdraw his trademark registration application and agree not to use the AGATHA mark in the United States. Hearing no response, in November 1986 plaintiffs' counsel wrote Quiniou's lawyer again, warning that Agatha would sue Quiniou for trademark infringement if he commenced use of the AGATHA mark in the United States. Quiniou's attorney responded that defendant wished to open retail stores in the United States which would sell primarily jewelry.

After an April 1987 meeting with Agatha and her counsel, Quiniou rejected a proposal that he accept a royalty-bearing license from Agatha with strict quality control provisions. Thus, on July 30, 1987 Agatha filed an opposition to Quiniou's trademark application urging that the goods Quiniou sought to identify with the AGATHA mark were either products that she had actually sold under her mark or were closely related to products in her various collections.

Undaunted by Agatha's protestations, in the fall of 1987 Quiniou opened a retail jewelry store named AGATHA in Rockefeller Center, Manhattan. Quiniou opened a second AGATHA jewelry store in Manhattan in June 1988.

Quiniou avers that all of his AGATHA stores worldwide portray the same general motif. The logo adorning the outside of the stores, the merchandise, catalogs, color scheme, wall coverings, sales counters, displays and packaging are alike in all stores. Quiniou sought to replicate the French AGATHA shops and convey the relation to them with the Manhattan stores. To this end, wall posters and catalogs are in French (with English translation) and all but one of the salespeople in the Manhattan shops are French. The paraphernalia of the Manhattan AGATHA shops contained in Exhibits 8 and 9 to the Quiniou affidavit bespeak the stores' association with Paris. Moreover, Quiniou declares that the advertisements for his New York shops "virtually always use[] the tag line 'the famous French shop of fashion jewel-

"Guest Designer," the host refers exclusively to

and showcases only her designer clothes.

ry, AGATHA.'" Quiniou Aff. ¶ 7. *See also id.* Exh. 10 (advertisements plainly indicating affiliation with Paris).

Subsequent to Quiniou's opening of the New York stores, Agatha Brown, Inc. encountered serious financing troubles (unrelated to defendant's New York stores) which prompted Agatha to close the company. Agatha expects to re-enter the fashion industry in the future using the AGATHA mark, but asserts that the presence of Quiniou's stores employing the AGATHA mark will hinder her efforts to return.

## DISCUSSION

Summary judgment may be granted under Fed.R.Civ.P. 56(c) if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When viewing the evidence, the Court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990); *see Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Thus, "[s]ummary judgment is appropriate if, ... 'no reasonable trier of fact could find in favor of the non-moving party.'" *United States v. All Right, Title & Interest in Real Property, etc.,* 901 F.2d 288, 290 (2d Cir.1990) (quoting *Murray v. National Broadcasting Co., Inc.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)). In making this determination, the district court may not resolve issues of fact; it may only ascertain whether such issues are present. *See The State of New York v. Sullivan,* 906 F.2d 910, 915 (2d Cir.1990); *Donahue v. Windsor Locks Bd. of Fire Com'rs,* 834 F.2d 54, 58 (2d Cir.1987). The non-movant, in response to a properly supported motion for summary judgment, may not rest on its allegations in the pleadings, but must adduce "significant probative supporting evidence" demonstrating that a factual dispute exists. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

The parties engage in a scholar's debate regarding the appropriateness of summary judgment in trademark cases. The Court will briefly attempt to dispel the uncertainty surrounding the question. Traditionally, this circuit viewed the typically complex factual issues involved in trademark litigation as unsuited for summary disposition. *See, e.g., Marcus Breier Sons v. Marvlo Fabrics,* 173 F.2d 29 (2d Cir.1949) (per curiam). It must be borne in mind, however, that after *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), summary judgment should not reflexively be frowned upon in any case provided there is an absence of triable issues of fact.

█ In trademark cases, the cornerstone issue of likelihood of confusion is a legal question. *See Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004–05 (2d Cir.1983). That determination, however, is a compound achieved through the weighing of the hoary *Polaroid* factors, plainly a factual inquiry. Thus, summary judgment may be issued in a trademark case only where no dispute exists with respect to the facts rendered material by the *Polaroid* test. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 877 (2d Cir.1986). *See also Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (materiality determined by reference to the substantive law governing the case).

█ Plaintiffs' "[e]xclusive ownership rights in a trademark do not automatically entitle [them] to protection against all use of the word on other products." *Edison Bros. Stores, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1553 (S.D.N.Y.1987). *See Pan American v. Panamerican School of Travel,* 648 F.Supp. 1026, 1032 (S.D.N.Y.), *aff'd,* 810 F.2d 1160 (2d Cir.1986). In order to prevail on each of their claims (see *supra* p. 464) other than the anti-dilution and common law unfair competition claims, plaintiffs must demonstrate the validity of their trademarks and that defendant's use of their trademarks poses a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or

indeed simply confused as to the source of goods in question." *Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1003 (2d Cir.1983) (citations omitted). *See Lois Sportswear, supra,* 799 F.2d at 871; *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Although the likelihood of confusion inquiry pivots on "a consideration of the facts and circumstances of each case," *Plus Products,* 722 F.2d at 1003, the Court is not without guidance on the question.

■ In *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), the Second Circuit Court of Appeals enumerated several nonexclusive factors which a court should consider in assessing the likelihood of confusion: (1) the strength of the prior owner's mark; (2) the degree of similarity between the marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) the junior user's good faith; (7) the quality of the junior user's good faith; and (8) the sophistication of the buyers. *Id.* at 495.

■ "No single *Polaroid* factor is determinative. Rather each must be considered in the context of all of the other factors, and from a balance of these determinations, one is able to reach the ultimate conclusion, whether there is a likelihood of confusion between the two parties' products." *Plus Products,* 722 F.2d at 1004 (citations omitted). Equitable factors may also come into play. *Gear, Inc. v. L.A. Gear California, Inc.,* 670 F.Supp. 508, 517 (S.D.N.Y.1987) (citation omitted). For example, the parties' conflicting interests in further use of the trademark, *see McGregor–Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1140 (2d Cir.1979) and "the nature of the senior user's delay in asserting its claim, and the harm to the junior user as compared to the benefit to the senior user that" will result from the requested relief. *Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 214 (2d Cir.1985) (citation omitted). Guided by these principles, and drawing all reasonable inferences in favor

of Quiniou, the Court perceives triable factual issues sufficient to defeat plaintiffs' summary judgment motion.

Because there is no dispute concerning the validity of plaintiffs' marks, the Court may proceed immediately to the factors implicated by the likelihood of confusion test. *Cf. Karmikel Corp. v. May Dept. Stores Co., Inc.,* 658 F.Supp. 1361, 1367–68 (S.D.N.Y.1987) ("... [A]lthough federal registration of the mark is *prima facie* evidence of the validity of that mark, the presumption of validity is rebuttable and applies only to the mark as used on the [product] specified in plaintiff's registration.").

### (1) Strength of Plaintiffs' Mark

The strength of a mark, or its distinctiveness, is equated with " 'its tendency to identify the goods sold under the mark as emanating from a particular source.' " *Lois Sportswear,* 799 F.2d at 873 (quoting *McGregor–Doniger, supra,* 599 F.2d at 1131). Two factors illuminate the "strength" inquiry: "(1) the placement of the mark on the spectrum of marks; and (2) the marketplace recognition value of the mark. The first factor identifies the inherent potential of the mark at the time of its first use. The second describes its actual consumer recognition value at the time registration is sought, or at the time it is asserted in litigation to prevent another's use." *Edison Bros., supra,* 651 F.Supp. at 1554 (citing 1 McCarthy, *Trademarks and Unfair Competition,* § 11.25, pp. 509–10 (2d ed. 1984).

To determine "distinctiveness" for purposes of the first inquiry, trademarks are classified as (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *McGregor–Doniger,* 599 F.2d at 1131. A generic term "refers ... to the genus of which the particular product is a species" and is not protectible. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). A descriptive mark "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Stix Products, Inc. v. United Merchants & Mfrs. Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968) (citations

omitted). "Descriptive marks, like generic ones, are considered inherently weak and may be protected or registered only upon a showing of 'secondary meaning.'" *Edison Bros.*, 651 F.Supp. at 1554 (citing *McGregor-Doniger*, 599 F.2d at 1131). *See* 15 U.S.C. § 1052(f) (descriptive marks protectible if they "become distinctive of the applicant's goods in commerce").

Suggestive terms require "imagination, thought and perception to reach a conclusion as to the nature of goods." *Abercrombie & Fitch*, 537 F.2d at 11. "An arbitrary or fanciful mark is a term having no association with the particular product or service." *Edison Bros.*, 651 F.Supp. at 1554. The latter two varieties of marks may be registered without reliance on secondary meaning. *Id.*

▮▮ The Court is mindful "that registered trademarks are presumed to be distinctive and should be afforded the utmost protection." *Lois Sportswear*, 799 F.2d at 871. *Accord Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299, 304 (2d Cir.1981). In trademark law, however, "personal names—both surnames and first names—are generally regarded as descriptive terms which require proof of secondary meaning." *815 Tonawanda Street Corp. v. Fay's Drug Co., Inc.*, 842 F.2d 643, 648 (2d Cir.1988) (citations omitted). *See* 3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 19.30 at 123 ("A name ... may become a valid trademark by virtue of secondary meaning."). Moreover, although a registered mark is presumptively distinctive, it does not inevitably follow that the mark is strong. *See Gear, Inc., supra*, 670 F.Supp. at 519. *See also Shaw–Barton, Inc. v. John Baumgarth Co.*, 313 F.2d 167, 169 (7th Cir.), *cert. denied*, 374 U.S. 831, 83 S.Ct. 1873, 10 L.Ed.2d 1054 (1963) ("It is well established that where descriptive words are used, the presumption of validity attaching to a registered trademark may be easily overcome.").

▮ Plaintiffs valiantly seek to circumvent the rule establishing personal names as descriptive terms by characterizing Agatha as an exceedingly uncommon name. Indeed, plaintiffs invite the Court to take judicial notice of the fact that Agatha is a rare name. The Court declines the invitation.

Defendant submits extensive research on the frequency of Agatha's appearance as a given name and in businesses. While defendant's analysis admittedly smells of the lamp, it goes far to refute plaintiffs' assertion of the name Agatha's scarcity. First and most notably, defendant found in Chicago an "AGATHA" clothing boutique which is unaffiliated with plaintiffs. *See* Factor Decl. Although the Factor declaration contains some inadmissible hearsay statements which cannot be considered on this motion, it adequately demonstrates the deficiency of plaintiffs' argument even in the limited field of women's fashion. *See also* Begler Aff. and Exhibits thereto (listing instances of use of name Agatha in various businesses). The Court sees no reason to depart from the general rule that a personal name is descriptive and requires proof of secondary meaning to acquire protection.

The inherent weakness of a descriptive term as an indicator of source thus requires plaintiffs to establish secondary meaning. *See Karmikel Corp.*, 658 F.Supp. at 1370. Failure to establish secondary meaning of a descriptive term renders the term ineligible for protection. *See Thompson*, 753 F.2d at 217.[3]

"'[P]roof of secondary meaning entails vigorous evidentiary requirements.'" *Thompson*, 753 F.2d at 217 (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 134 (S.D.N.Y.1972)). Moreover, even if secondary meaning is acquired, it will "not prevent the use of [the] term by one whose use had begun

---

**3.** The second factor weighed in evaluating the strength of a mark is the mark's "commercial strength: that is, its significance in the marketplace as identifying the origin of goods." *Edison Bros.*, 651 F.Supp. at 1555 (citations omit-

ted). Because the factual inquiry involved in studying this second factor in large measure duplicates the secondary meaning question, the Court's analysis will address both together.

before the secondary meaning was acquired." *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980). In conducting the secondary meaning inquiry, the Court may be guided by (1) advertising expenditures; (2) consumer studies linking the name to the source; (3) sales success; (4) unsolicited media coverage of the product; (5) prior attempt to pirate the mark; and (6) duration of plaintiff's exclusive use of the mark. *Thompson*, 753 F.2d at 217.

■ At the outset, it is apparent that the commercial strength/secondary meaning the AGATHA mark has acquired is a factual issue which precludes summary judgment. Agatha's reputation in the fashion design industry cannot be seriously questioned. Several factors, however, militate against expanding this indisputable fact into a finding of secondary meaning and exceptional commercial strength. First, Agatha's showing with respect to her high recognition level is overwhelmingly confined to individuals associated with the fashion industry. The vast majority of advertising and media coverage regarding Agatha appeared in *Women's Wear Daily*, which plaintiffs themselves refer to as " 'the Bible' of the women's fashion *industry*." Pltffs' Mem. at 29 (emphasis added). Plaintiffs have not demonstrated sufficient recognition of AGATHA among the purchasing public to warrant summary judgment on the secondary meaning issue.

Plaintiffs make much of the fact that over the years Agatha has licensed the use of her name to divisions of various apparel companies. They also underscore that no third-party registrations for any AGATHA marks exist in any related fields. The short response to this is that "[i]ncontestable status does not make a weak mark strong." *Oreck Corp. v. U.S. Floor Syst., Inc.*, 803 F.2d 166, 171 (5th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). It is incumbent upon plaintiffs to show that their descriptive mark triggers a note of recognition with purchasers which elevates the mark to a degree worthy of protection. Plaintiffs thus far have not accomplished this.

■ Plaintiffs' assertion of secondary meaning is further impaired by the fact that Agatha Brown, Inc. has closed its operations and Agatha is presently without a vehicle for marketing her creations. *See Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 105 (2d Cir.1985) (plaintiff's "small and declining share of the market" weighs against finding of secondary meaning). Plaintiffs' evidence of consumer recognition gathered prior to Agatha's cessation of business is simply too scant to support summary judgment.

Further, a review of the advertisements submitted by plaintiffs to bolster their assertion of secondary meaning in the AGATHA mark displays that media exposure of the AGATHA mark, *solus*, has been minimal. The vast majority of references is to "Agatha Brown." A factual question thus remains concerning whether consumer recognition of that name is sufficient to carry over to the mark AGATHA, *solus*.

Finally, although failure to undertake a consumer survey concerning recognition of the AGATHA mark is not by itself fatal to plaintiffs' assertion of secondary meaning, *see Cancer Research Inst. v. Cancer Research Soc'y*, 694 F.Supp. 1051, 1055 (S.D.N.Y.1988), where the other evidence of consumer recognition is hardly overwhelming, the absence of survey evidence weighs heavily against plaintiffs' position.

### (2) Similarity

■ The inquiry concerning similarity of the pertinent marks questions "whether the general impressions conveyed by the two marks are sufficiently alike that consumers are likely to be confused." *Gear*, 670 F.Supp. at 519 (citing *McGregor–Doniger*, 599 F.2d at 1133–34). "Even close similarity between two marks is not dispositive.... the similarity must be assessed in terms of its effect upon prospective purchasers ..." *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 257 (2d Cir. 1982) (citation omitted). As stated by Judge Stanton:

Similarity, for these purposes, is a functional test which must include "all the factors that could reasonably be ex-

pected to be perceived by and remembered by potential purchasers" to determine whether it "is likely to provoke confusion." *McGregor–Doniger*, 599 F.2d at 1133. One must consider both the similarity of the names and the manner of their presentation to the public. *Edison Bros.*, 651 F.Supp. at 1555 (quoting *McGregor–Doniger*, 599 F.2d at 1133). Again, the probative evidence is inconclusive and summary judgment is inappropriate.

The Court's initial impression is that commanded by common sense: defendant's New York shops bear the precise name that is the subject of two of plaintiffs' trademark registrations. Differences *do* emerge, however, upon cursory examination. As noted above, plaintiffs' use of the mark AGATHA, *solus,* has been somewhat infrequent over the years. Further, defendant's use of block letters in a peculiar style serves to distance further the two marks. *See, e.g.,* Quiniou Aff.Exhs. 3, 9, 10. *Karmikel*, 658 F.Supp. at 1373. Finally, defendant's use of the mark conveys a connection to France. The logos on defendant's boxes, ribbons, envelopes, bags and catalogs place the word "PARIS" and sometimes "BIJOUX" alongside the name Agatha. Defendant's advertisements and stores themselves impart an unmistakable relation to France. See *supra,* pp. 466–467. This deliberate attempt to convey an association with France tends to negate a likelihood of confusion and gives rise to another triable issue of fact.

### (3) Proximity of Goods

"The degree to which consumers are likely to be confused about the sources of the product depends somewhat on their competitive closeness." *Edison Bros.*, 651 F.Supp. at 1556. Plaintiffs argue "that the goods sold by Quiniou are not different from products which Agatha has sold under her mark." Pltffs' Mem. at 48–49. The Court regards this position untenable. Plaintiffs have no trademark registrations for jewelry; indeed, Agatha had only begun to show samples of her new jewelry line when defendant opened his first New York store. Thus, plaintiffs have accumulated no significant prior rights with respect to jewelry.

It does not follow, however, that the parties' noncompeting goods have no practical overlap. In assessing whether noncompeting goods share commercial proximity, the Court may inquire into

"the physical attributes or other inherent characteristics of the goods, such as their form, composition, texture or quality; the service or function for which they are intended; the manner in which they are advertised, displayed or sold; the channels through which they are sold; and the class of customers for whom they are designed and to whom they are sold."

3A R. Callmann, *Unfair Competition, Trademarks and Monopolies,* ¶ 20.52, at 311 (4th ed. 1983).

It is settled that women's apparel is commercially related to cosmetics, toiletries and the like, which are deemed complementary products to the clothing. *See Edison Bros.*, 651 F.Supp. at 1557. This link recognizes the commercial reality that products within these groups may contribute to an overall image or "look" sought by female consumers, and are likely to be purchased in the same shopping excursion or considered together by women attiring themselves.

The Court discerns no principled reason to exclude jewelry from the family of women's apparel, cosmetics and other beauty aids. Jewelry undoubtedly is of equivalent importance to these products in creating a desired appearance. The items are typically advertised in the same media and frequently are available in the same stores. To overlook jewelry's place among these products would be disingenuous.

Acknowledging the commercial proximity of the products as a general matter does not conclude the analysis here. Several factors temper the above conclusion. First, Agatha does not presently have her marks in any channel of trade. This circumstance obviously detracts from plaintiffs' argument that her products and defendant's jewelry attract overlapping portions of the purchasing public. Moreover,

even if Agatha's merchandise was in commerce, the risk of consumer confusion of her products with Quiniou's jewelry is reduced by the fact that Quiniou's shops sell only his jewelry. Agatha has never owned a shop from which she sold only her merchandise. The Court is entitled to presume that the ordinary consumer possesses at least a modicum of intelligence. *See McGregor–Doniger*, 599 F.2d at 1138 (citation omitted). The Court deems it improbable that a purchaser who was familiar with Agatha (in all likelihood as a designer) would assume that defendant's *jewelry* store represented the *fashion designer's* initial foray into private store ownership. Further, the unmistakable French motif of defendant's shops separates his shops from Agatha's designs certainly to a degree sufficient to preclude summary judgment.

### (4) Likelihood Plaintiffs Will Bridge the Gap

The inquiry regarding the likelihood that the prior user will bridge the gap questions "whether the two companies are likely to compete in the same market." *Charles of the Ritz Group, Ltd v. Quality King Distrib., Inc.*, 832 F.2d 1317, 1322 (2d Cir. 1987). Plaintiffs have submitted evidence establishing that Agatha plans to enter the jewelry market when she regains the financial wherewithal to do so. Thus, this *Polaroid* factor tips in plaintiffs' favor.

### (5) Actual Confusion

"While actual confusion is not a prerequisite to a finding of infringement, 'there can be no more positive proof of likelihood of confusion than evidence of actual confusion.'" *Gucci v. Gucci Shops, Inc.*, 688 F.Supp. 916, 926 (S.D.N.Y.1988) (citations omitted). Plaintiffs adduce but one incident of actual confusion, and it is of scant probative value. Carol Taxon, a national sales manager for Agatha Brown, Inc., declares that upon encountering an advertisement in *New York* magazine for defendant's Rockefeller Center store, she approached Agatha and asked "when did we open a retail jewelry store?". Taxon Decl. ¶ 6. The Court finds the assumption implicit in Taxon's question surprising in view of the presence of the phrase "The Famous

French Shop of Fashion Jewelry" immediately above the name "AGATHA" in the advertisement and the appearance of the word "PARIS" directly beneath the "AGATHA" name. Even when the Taxon declaration is credited, as it must be on this motion, *see Jaroslawicz v. Seedman*, 528 F.2d 727, 731 (2d Cir.1975), it remains immaterial because Taxon is not an ordinarily prudent purchaser whose impressions are significant in the likelihood of confusion calculus. *See Plus Products*, 722 F.2d at 1003. She is a fashion professional with substantial background in that industry and her impression cannot reasonably be said to reflect that of the average consumer. Plaintiffs have demonstrated no probative instances of actual confusion.

### (6) Defendant's Intent

Evidence of a deliberate intent to imitate another's mark "may be sufficient to justify the inference that there is confusing similarity." *American Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 563 (2d Cir.1953) (Hand, J.). *Accord Harlequin Enterp. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 949 (2d Cir.1981). "If the junior user has 'adopted the mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement.'" *Edison Bros.*, 651 F.Supp. at 1560 (citation omitted). In the absence of evidence of bad faith, however, courts ordinarily presume the defendant acted in good faith. *See Karmikel*, 658 F.Supp. at 1375.

This factor is also unsuited to summary disposition. Subjective issues such as good faith and intent are generally inappropriate subjects of summary judgment. *See American Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 353 (2d Cir.1981); *Friedman v. Myers*, 482 F.2d 435, 439 (2d Cir.1973). Defendant avers that his use of the "Agatha" mark in the United States is simply an extension of his use of the mark elsewhere in the world. Plaintiffs correctly assert that any priority of use defendant acquired outside the United States confers no priority of trademark rights in this country. *See* 1 J.T. McCarthy, *Trademarks and Unfair Competi-*

*tion,* § 16.7, at 735. This does not, however, foreclose his use of a mark employed by a prior user. *See Mushroom Makers,* 580 F.2d at 48. Indeed, Quiniou's actual and constructive knowledge of Agatha's use of AGATHA and its variations does not automatically demonstrate bad faith. *See Edison Bros.,* 651 F.Supp. at 1560.

On the record before the Court, the determination of whether defendant sought to trade on plaintiffs' reputation clearly must await trial. Plaintiffs' argument on the issue is founded primarily on presumptions which do not obtain under the trademark law. At the very least, defendant's contention that he selected the Agatha mark for use in this country based on his prior use of the name outside of the United States is sufficient to defeat summary judgment on the good faith question.

### (7) Quality of Defendant's Products

"A marked difference in quality of allegedly confusingly similar products tends to decrease the possibility of confusion of the products." *Yankelovich, Skelly and White, Inc. v. White, Yankelovich, Skelly Consulting Group, Inc.,* 14 U.S.P.Q.2d (BNA) 1384, 1989 WL 115848 (S.D.N.Y. 1989). Neither party engages in more than a cursory discussion of this factor. Thus, it appears that this concern may be dismissed. *See Edison Bros.,* 651 F.Supp. at 1561.

### (8) Sophistication of Buyers

In evaluating this factor, the Court seeks to gauge "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods...." *McGregor–Doniger,* 599 F.2d at 1137. Common sense dictates that price is the crucial factor in ascertaining the depth of attention the ordinary purchaser is likely to apply to a given purchase. *See Karmikel,* 658 F.Supp. at 1377.

Plaintiffs submit that this factor should not be of moment because even the most seasoned shoppers are so accustomed to linking the name of well known designers to an array of products that they would not even blink before associating jewelry sold under the AGATHA mark with plaintiffs. Neither party supplies actual figures in connection with the cost of their products, although defendant states that his merchandise is relatively expensive. Judging from plaintiffs' exhibits, it appears that the same observation might be made concerning Agatha's designs.

It may safely be ventured that bargain-basement shoppers have little or no acquaintance with either party's merchandise. Thus, although the record is insufficient to support summary judgment on the issue, it is likely that the purchasers of both parties' items devote substantial thought and attention when buying these somewhat costly products. This exercise of care by the purchasers tends to accord a degree of sophistication and discrimination which the Court believes is not as easily blurred as plaintiffs submit.

Given the wealth of factual issues that have been distilled through the *Polaroid* analysis, the Court perceives no useful purpose in threading its way through the relevant equitable factors. The Court proceeds then to plaintiffs' motion for summary judgment on their remaining claims.

### *Unfair Competition*

 "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another." *Saratoga Vichy Spring Co.,* 625 F.2d at 1044 (citations omitted). Thus, some showing of bad faith is crucial to the claim. *Id.* As noted *supra,* 472, issues of intent and good or bad faith are singularly ill-suited for summary disposition. Plaintiffs' motion on their unfair competition claim therefore is denied.

### *Anti-dilution*

 Plaintiffs also move for summary judgment on their New York anti-dilution claim, N.Y.Gen.Bus.Law § 368–d. The claim entails two components: 1) proof of a particularly strong mark through a distinctive quality or the acquisition of secondary meaning; and 2) a likelihood of dilution.

*See Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 369 N.E.2d 1162, 1165–66, 399 N.Y.S.2d 628, 632 (1977). Dilution involves "the whittling away of an established trademark's selling power and value through its unauthorized use by others upon dissimilar products." 1954 N.Y.Legis.Ann. 49. "Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." *Mead Data Cent. Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1030 (2d Cir.1989) (citations omitted). In *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624 (2d Cir. 1983), the Second Circuit Court of Appeals limned the anti-dilution statute as protecting "the selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public." Against this landscape, the Court deems summary judgment on the anti-dilution claim inappropriate.

As noted *supra,* p. 469, the AGATHA mark is descriptive, not distinctive, and thus requires proof of secondary meaning to merit protection under the anti-dilution statute. The record before the Court does not disclose that AGATHA has acquired secondary meaning or distinctiveness among the relevant consumers. *See supra,* p. 470. Summary judgment is therefore denied.

### Rule 11 Sanctions

Defendant contends that the imposition of sanctions against plaintiffs pursuant to Fed.R.Civ.P. 11 is warranted because plaintiffs' summary judgment motion was frivolous. "[T]he imposition of sanctions is mandatory when a claim has absolutely 'no chance of success.'" *Motown Prod., Inc. v. Cacomm, Inc.,* 849 F.2d 781, 785 (2d Cir.1988) (quoting *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985)). The Second Circuit has admonished district courts, however, to "avoid hindsight" and "resolve all doubts in favor of the signer" of the paper sought to be pilloried as frivolous. *Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir.1986), *cert.*

*denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

In filing the summary judgment motion, it is apparent that plaintiffs counted on demonstrating that Agatha was so unusual a name that it qualified as a distinctive mark, or that Agatha Brown's reputation was so firmly entrenched in the minds of relevant consumers that her marks had acquired secondary meaning. Although the deficiencies in these contentions were manifest, the Court cannot say that plaintiffs' positions were outside the scope of legitimate advocacy. The Court declines to impose sanctions.

### CONCLUSION

For the reasons described above, the Court denies all motions. The parties are to appear for a pretrial conference on September 24, 1990 at 11:45 a.m. in courtroom 228.

SO ORDERED.